ANNA S. MEIER et al., Appellants, v. CHRISTINA J. BUCHTER et al.

Division One, June 19, 1906.

1. WILL: Undue Influence: Helpless Daughter: Change of Testator's Attitude: Unnatural Disposition: Question for Jury. The large question presented by the will contest touches testator's only unmarried daughter, a deaf mute, toward whom, when left to himself, he felt the attachment and responsibility due to her helplessness, her dumb faithfulness and his duty. His other seven children were married, and to them he had made advancements, from $1,500 to $3,500 each, and by his will he left, out of the estate of about $21,000, to three of them $50 each, gave to the afflicted daughter about $2,150 in trust for life, and the residue of the estate equally to four other children, one of whom, after she had separated from her husband about 18 months prior to the testator's death, made her home with her father and the afflicted daughter, and began to poison his mind towards her, accusing her of stealing from him. Up to that time, the afflicted daughter had for five or six years been his housekeeper, he treating her with tender affection,

Meier  v.  Buchter.

their dispositions being compatible, but thereafter the afflicted daughter's life became clouded and unhappy. About ten days before the will was made, after he had become afflicted physically and mentally, she was taken to the city hospital, and from there some days later to an insane asylum, but who was the procuring cause of this is not shown, but there is no evidence that he consented to have her taken from him or that he was aware of the purpose or significance of the act. Attended and supported by two daughters who were made residuary legatees, he was taken to the office of their business agent, who drew the will, and the next day they gave it out that they had taken him to see a doctor, but that he had made a will was kept a secret, and when he died, two months later, aged eighty years, the daughters given $50 were not notified, and one of them who lived in the country learned of his death on her usual Sunday visit, after he had been dead for two days. *Held, first,* that it cannot be seen how the testator could have become estranged from the afflicted daughter unless he had lost his own mental equipose through his own feebleness of mind or the machinations of others operating thereon; *second,* the unnatural disposition made for the afflicted daughter called for explanation; *third,* there was substantial evidence of undue influence and testamentary incapacity, and when that evidence is considered in connection with the unnatural disposition, the issue became one for the jury.

2.  ——: **Unnatural Disposition: Undue Influence: Testamentary Capacity.** An unnatural disposition of property standing alone will not avoid a will, but where there is other substantial evidence of undue influence and of testamentary incapacity, both being issues, the result of such unnatural disposition may be considered by the jury along with other facts tending to show undue influence or testamentary incapacity.

3.  ——: **Undue Influence: Fraud Inferred: Presumption.** Undue influence need not be shown by direct proof, but may be established by proof of facts from which it may be rationally inferred. Fraud is never presumed, yet it may be proved by indirect evidence, as in the case of undue influence.

4.  ——: **Fraud: Insufficient Pleading: Appeal.** Where no contention was made at the trial that the petition was insufficient as a charge of fraud, and no motion requiring it to be made more specific was made, the appellate court will not determine that assignment made for the first time on appeal.

5.  ——: **Evidence: Advancements.** Testimony of advancements made to testator's children is pertinent as tending to show an unnatural will—its weight, varying with circumstances, being for the jury.

6.  ———: ———: **Statements of Devisees: Conspiracy.** Where the petition charges that there was a conspiracy between all the contestees to procure the making of a fraudulent will, and testimony has been introduced tending to show privity of design on the part of the contestees in the concoction of the will, evidence of the statements and admissions made by some of the contestees, having "joint interests" in the result with the others, is competent. It is elementary law that when there has been evidence tending to show that a conspiracy existed, the admissions of any one of the conspirators along the line of the conspiracy, touching its subject-matter and in furtherance thereof, is admissible. [Distinguishing Schierbaum v. Schemme, 157 Mo. l. c. 17.]

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough*, Judge.

REVERSED AND REMANDED.

*Sterling P. Bond* for appellants.

(1) Where there is evidence, as in this case, that at the time the will was made testator was old, feeble in body and mind from sickness and old age, and had not sufficient understanding and intelligence to transact his ordinary business affairs and to comprehend the transaction then in question, the nature and extent of his property, the natural objects of his bounty and to whom he was giving the same, then he had not sufficient capacity to make a will. Aylward v. Briggs, 145 Mo. 609; Carl v. Gabel, 120 Mo. 290. (2) The plaintiffs showed that undue influence was exercised over the mind of testator, especially by his daughter, Mrs. Buchter, and also Mrs. Timmer, who assisted him to the office of their agent, who drew the will. The testimony of the defendant, Louisa M. Thomas, alone shows the undue influence of Christina J. Buchter over her father. Carl v. Gabel, 120 Mo. 296; Dausman v. Rankin, 189 Mo. 703. (3) Undue influence, like every other question of fraud or bad faith, is a question of fact, and can rarely be proved by direct or

positive evidence, but may be established by facts and circumstances. Dausman v. Rankin, 189 Mo. 703; Carl v. Gabel, 120 Mo. 297; Doherty v. Gilmore, 136 Mo. 414. (4) Where facts are proved as will authorize a jury to find the existence of undue influence, then the burden shifts, and it then devolves on the party charged to exonerate himself from such charge, in like manner as in the case of fiduciary or confidential relation. Christina J. Buchter and Bertha A. Timmer occupied this relation. Gay v. Gilliland, 92 Mo. 263; Carl v. Gabel, 120 Mo. 297; Gordon v. Burris, 153 Mo. 241; Dingman v. Romine, 141 Mo. 474; Dausman v. Rankin, 189 Mo. 703. (5) Any influence, howver exercised, which destroys free agency and substitutes the will of another for that of the person in whose name the act brought in judgment is done, is undue and wrongful, and, as bearing on the question of undue influence, the relationship of the parties to each other, the mental condition of the person imposed on, and the character of the transaction should be taken into consideration. Dingman v. Romine, 141 Mo. 476. (6) The evidence shows that fraud was perpetrated upon testator in procuring the will, and fraud and deceit in its procurement vitiates a will equally as readily and completely as it does a contract or deed. Gordon v. Burris, 153 Mo. 241; Harvey v. Sullens, 46 Mo. 153; Hughes v. Rader, 183 Mo. 608. (7) A demurrer admits every material fact proven and which may be inferred from the testimony to be true, and should never be sustained where there is any evidence at all to sustain an issue. Young v. Webb City, 150 Mo. 341; Twohey v. Fruin, 96 Mo. 104; Gannon v. Gas Co., 145 Mo. 516; Gordon v. Burris, 153 Mo. 223; Baum v. Fryear, 85 Mo. 151; Noeninger v. Vogt, 88 Mo. 480. (8) The clause concerning advancements is a badge of fraud. Baldwin v. Whitcomb, 71 Mo. 659; Gordon v. Burris, 153 Mo. 241; Comstock v. Rayford, 12 S. & M. 369; Hauts v. Shepherd, 79 Mo. 147; Hodge v. Hubb, 94 Mo. 503; Bump on Fraud. Convey., 500;

Snell v. Whitcomb, 104 Mo. 188; Gerard v. St. Louis Car Wheel Co., 46 Mo. App. 97; Mabary v. McClurg, 74 Mo. 575. (9) Mental unsoundness may be inferred. Doherty v. Gilmore, 136 Mo. 414.

*Muench, Walther & Muench* for respondents.

(1) After the proponents had proven the execution of the will and that the testator was sane and of the requisite age, it devolved on the contestants to establish the incompetency, undue influence or fraud. Sehr v. Lindemann, 153 Mo. 276; Fulbright v. Perry Co., 145 Mo. 432; Maddox v. Maddox, 114 Mo. 35; Doherty v. Gilmore, 136 Mo. 414; McFadin v. Catron, 138 Mo. 197. (a) Undue influence must not only be shown to have existed, but it must be shown to have been actually exercised at the time the will was executed. Tibbe v. Kamp, 154 Mo. 545; Brinkman v. Rueggesick, 71 Mo. 553; Richardson v. Smart, 152 Mo. 623. (b) Affirmative proof of fraud or undue influence must be made either by direct facts shown or by facts and circumstances from which undue influence results, as a reasonable and fair inference, and not as a mere conjecture. Tibbe v. Kamp, supra; Doherty v. Gilmore, 136 Mo. 420; Riley v. Sherwood, 144 Mo. 354. (2) There was in this case no such confidential relation between the testator and any of the proponents as would shift the burden of proving absence of fraud or undue influence to the devisees. Tibbe v. Kamp, supra; Richardson v. Smart, supra. (3) A person having sufficient mental capacity has the right to make an "unreasonable, unjust, injudicious will," and neither courts nor juries are justified in altering the disposition of his property, "simply because they may think the testator did not do justice to his family connections." Tibbe v. Kamp, supra; Berberet v. Berberet, 131 Mo. 411; Aylward v. Briggs, 145 Mo. 605; Maddox v. Maddox, supra; Jackson v. Hardin, 83 Mo. 185; McFadin v. Catron, 138 Mo. 197.

(4) "Fraud upon a testator consists in making that which is false appear to him to be true, and so affecting his will." Gordon v. Burris, 153 Mo. 241; 1 Bigelow on Fraud, p. 572; Beach on Wills, sec. 107; 1 Redfield on Wills, p. 510. The issue of fraud should not be considered by this court, as the facts constituting the fraud were not pleaded by the plaintiffs as required by the decisions in this State. Story v. Story, 188 Mo. 110; Nagel v. Railroad, 167 Mo. l. c. 96. (5) There was no error in excluding testimony as to alleged complaints by the testator of his daughter's alleged treatment of him, as this evidence was not competent. Schierbaum v. Schemme, 157 Mo. 1; Walton v. Kendrick, 122 Mo. 504; Gordon v. Burris, 141 Mo. 602; Gibson v. Gibson, 24 Mo. 227. There was no error in excluding admissions by one or more of the defendants, as others were not bound thereby, all having separate interests under the terms of the will. Schierbaum v. Schemme, supra; Von de Veld v. Judy, 143 Mo. 19; Nussear v. Arnold, 13 S. & R. 328; Clark v. Morrison, 25 Pa. St. 456; Titlow v. Titlow, 54 Pa. St. 222; Shailer v. Burnstead, 99 Mass. 127. (6) Where there is no substantial evidence of incompetency, undue influence or fraud, it is the duty of the court to direct a verdict for the proponents. Southworth v. Southworth, 173 Mo. 59.

LAMM, J.—Plaintiffs sued on May 5, 1903, to set aside the will of Theodore Albert Thomas, charging undue influence and fraud—the product of a conspiracy between proponents—and testamentary incapacity. A verdict for proponents being coerced by a mandatory instruction, *nisi*, contestants appeal, assigning error in the exclusion of testimony and in the giving of said instruction.

Contestants are two married daughters of decedent, Anna S. Meier and Emilia A. Bacher, and a son, Louis A. Thomas. The petition charged that one daughter, Louisa M. Thomas, joined with the other

contestees in the wrongful concoction of the will, but at the trial she was used as a witness for contestants and the petition was amended by eliminating the charge as to her.

The case made is this:

Testator died September 12, 1902, full of years, to-wit, four score, seized of realty in the city of St. Louis and owning certain chattels—all alleged as of the value of $20,000, but estimated by one witness at $21,553.31, and by another at $20,753.31—leaving one son, Louis A. Thomas, six married daughters, to-wit, Anna S. Meier, Emilia A. Bacher, Christina J. Buchter, Bertha A. Timmer, Laura R. Kirchner and Emma L. Riddle, and one unmarried daughter, Louisa M. Thomas, and the following will, executed on the 22nd day of July, 1902:

"I, the undersigned, Theodore Albert Thomas (a widower), of the city of St. Louis, State of Missouri, do make, publish and declare the following to be my last will and testament hereby revoking and annulling all former wills and codicils by me made, to-wit:

"Subject to the payment of my just debts and funeral expenses I dispose of my entire estate in the following manner:

"1.   I give and bequeath to my son Louis Albert Thomas, and to my daughters Anna S. Thomas, wife of Henry Meyer, and to Emilia A. Thomas, wife of Louis Bacher, the sum of fifty dollars each, hereby stating that I have made to each of them numerous advancements heretofore.

"2.   I give and bequeath to Louis Timmer a deed of trust recorded in book 1362 page 270 of the St. Louis Recorder's office, given by Herman Wilhelm and wife to Heinrich Grebes, trustee, now held by me originally for the amount of $2,400—on which $250 was paid on principal in trust for my daughter Louisa M. Thomas to have, hold and use for her benefit for life, and after

her death any amount remaining of said sum at present invested, to her surviving sisters and brother.

"3. All the residue of my entire estate, real and personal wherever situated or found, I give and bequeath to my following named four children, share and share alike, to-wit: Laura Rosa Thomas, wife of Barney Kirchner, Christina J. Thomas, wife of Emile Buchter, Bertha A. Thomas, wife of Louis Timmer, and Emma L. Thomas, wife of George Riddle.

"4. The trustee for my said daughter, Louisa M. Thomas, shall have the right to use and apply interest or principal of deed of trust thus above mentioned or paid off and reinvested by him, the interest and principal of such new investment for her support and enjoyment or any other purpose as he may see fit.

"5. Finally I appoint my said son, Louis Albert Thomas, and my said son-in-law, Louis Timmer, executors of this my last will and testament without being required to give a bond for the administration of my estate, hereby giving and granting unto my said executors full power and authority at public or private sale to sell my real estate at such price and on such terms as they may deem best.

"In witness whereof I have hereunto set my hand at the said city of St. Louis, Missouri, this 22d day of July, 1902."

Testator, up to, say, three or four months before he died, was a gardener by occupation, digging and delving with his own hands and eating bread in the sweat of his face, vending his vegetables at a market house stall in the city of St. Louis, and seems to have been a man of vigor of body and mind, of simple and few wants, a reticent man, rather addicted to a newspaper, a mug of beer and a pipe of tobacco of the cool of an evening—a sturdy man of thrift and hard-headed business sense until disease cut him down in the May preceding his death. In May painful dropsical swellings developed in his legs, his slippers and shoes had

to be ripped up to be wearable, he began to languish
and pine, his pipe, his mug of beer and his newspaper
were put aside, and he was plainly entering upon the
valley of the shadow of death, could walk but a short
distance at a time and that only with the aid of a cane
and timely rests. From thence onward, Mrs. Buchter
tended the garden and the market stall and collected his
rents—he having tenements and tenants. Throughout
June he became more feeble and silent, more tottering
in his foot-steps and often needing assistance in mov-
ing about, and in this condition, about the 30th of
of June, he had a ''stroke,'' the exact character of
which is unexplained. There is evidence indicating it
was a stroke of paralysis, whereby his left side, includ-
ing his left arm, were affected; there is also evidence
it was some form of heart trouble, causing him to fall,
and which thereafter recurred in spells of fainting.
During this time, either his eyesight was affected and
he could no longer read and thought he saw soot on his
newspaper and soot in the air, or else he had fixed de-
lusions of that character. During June, and thence for-
ward after said stroke, lapses of memory and spells
of listlessness grew frequent and noticeable. For ex-
ample, he would not, until aroused, know his own chil-
dren when they called to see him; he seemed to be ob-
livious to what passed from day to day, and no longer
noticed or spoke to his neighbors when they greeted
him.

Up to the time testator made the will in question,
it is shown that his fatherly affection and disposing
mind towards his children seemed by word and act to
have flowed out evenly to each of them, except that he
to a degree recognized and expressed a certain accen-
tuated duty to his unmarried daughter, for reasons
hereinafter set forth. It appears from the proof ad-
duced that he had made advancements to all his mar-
ried daughters in uniform sum at intervals, aggregat-
ing, say, $3,500 or $3,800 to each; to his son an ad-

vancement of $1,500; and to his unmarried daughter, Louisa M., *nothing*. It appears that about three years before he died he sold a substantial part of his real estate and at that time advanced sums to his married daughters, dividing the proceeds in that way, bringing the aggregate up to the amount aforesaid to each.

The unmarried daughter was handicapped by misfortune in that she was dumb, that is, practically so, though she could speak a few words. With dumbness went the allied affliction, deafness, *i. e.,* she was substantially deaf, though she could hear somewhat and, possibly, could interpret the varying tones of the human voice indicating this, that, or the other emotion, provided the voice was a familiar voice. She had been educated for eight years at (presumably) a deaf and dumb school at Fulton, Missouri, and it is said she attended for two years at (presumably) a like school in Jacksonville, Illinois, and there graduated, thereby becoming somewhat adept in the eye-reading of language falling from familiar lips. Her mother died in 1895 and thereafter she became her father's housekeeper, doing the cooking and attending to all the household duties except that off and on one of her sisters came to aid in cleaning up, and except that, about a year and a half before testator's death, one of the contestees, Mrs. Buchter, with her children, moved into one-half of the family residence and kept house there—testator and Louisa living in the other half and Mrs. Buchter from thence onward taking charge and doing the principal part of the housekeeping. There was evidence tending to show that Mrs. Buchter's moving to her father's house came about through her marital infelicity at her own home, she living separate from her husband who refused to support her. There was evidence tending to show that Louisa, toward the close of her father's days, was not capable of attending to him and doing the housework; there was also evidence tending to show that up to the appearance of Mrs. Buchter in

the house the relations between testator and his daughter, Louisa, were perfect in tenderness, their intercourse being what was to be expected between a father and an afflicted daughter and their dispositions compatible; but after the appearance of Mrs. Buchter their relations became somewhat strained—she, Mrs. Buchter, complaining to her father of Louisa's stealing from him and by other complaints causing jars and discords, and Louisa's life thence onward became clouded and unhappy. About the 10th of July, or say, ten or twelve days before the will was written, through means and for reasons not satisfactorily explained in this record, Louisa was taken to the city hospital, and from thence, some days later, to the insane asylum, where she was at the time the will was written and where she remained until she testified in the cause. Who was the procuring cause of her removal from her father's sight and her father's roof (her shelter for the forty-two years of her life) is not disclosed, but it appears that two policemen came and took her away. There was evidence indicating that Mrs. Buchter and Mrs. Timmer were present in the house at the time. One Henry Meier, husband of plaintiff, Anna S., came five minutes before Louisa was taken away. Plaintiffs offered to prove by him that Mrs. Buchter admitted having her sent away, but this evidence was excluded. Louisa says one policeman came and the father asked, "What do you come for?" and the policeman said something Louisa did not understand, whereupon the father said, "Well, she is not well," and the policeman said to him to get away or to get out and then the policeman locked the door and soon afterwards two other policemen came and took her away. Other than the physical fact that the daughter was removed and other than testimony that she had been looked upon and recognized in the family as "feeble minded," the necessity of her being taken away at that time is not shown.

If the evidence of Louisa is to be believed, her fa-
ther had a natural testamentary disposition towards
her, having promised to give her the homestead and an
estate besides.  Not only so, but it is shown by her tes-
timony that Mrs. Buchter came between her and her
father and opposed and changed her father's desire
in the premises.  If her evidence is to be believed, her
father, physically, as well as mentally, came under the
domination of Mrs. Buchter and that domination was
tinged with property and testamentary hopes and de-
signs, and exerted on that line.  If other evidence is to
be believed, a former will was executed which was in
the possession of some of the contestees, but was not
produced at the trial, and (singularly enough) its pro-
duction was not called for.  The size of the families of
contestants and contestees was not in evidence, further,
than it was shown that the Timmer family was not so
large as the family of the son, Louis A. Thomas.  Nor
was the condition in life of contestants and contestees
shown further than that facts appear from which it
might be broadly inferred that Louisa M. Thomas was
not only without capacity for earning a livelihood, but
was without means of her own and entirely dependent.
It also appeared that Mrs. Buchter and Mrs. Timmer
were possessed of means—at any rate, they collected
rents of their own and seem to have had occasion and
use for a business agent to attend to their affairs, and
that business agent was Krembs who drew the will.  It
also appears that two of contestees have long resided
away from their father in Burlington, Iowa, but visited
him July 4, 1902; that contestants lived in St. Louis
or in proximity thereto; that they visited their father
with regularity and he, when able, visited them.  There/
is evidence tending to show that after Mrs. Buchter
assumed charge of her father's house and (towards
the last) of his affairs, her sisters, contestants, were not
made welcome on their visits to their father.  One of
these sisters, living towards Clayton in St. Louis

·county, was not informed of her father's death, but, ·coming to visit him on a Sunday, as usual, she found him lying in his coffin, he having died the Friday before.

Proponents, assuming the laboring oar to make ·out a prima facie case, placed upon the stand Mr. Ray .and by him showed that he was a deputy probate clerk .and identified the paper writing purporting to be the will of Theodore Albert Thomas. They next introduced Mr. Krembs, who drafted the will, and Miss Bocka, his stenographer—the witnesses to the will —and having made out a prima facie case, followed it by the introduction of the paper itself, and rested— none of the proponents taking the stand. The evidence heretofore outlined came from contestants and some ·neighbors of decedent. By Krembs and Miss Bocka, it was shown that in the forenoon of July 22nd one of proponents, either Mrs. Timmer or Mrs. Buchter, appeared at Krembs' office and told him in substance that Mr. Thomas and her sister had gone to a doctor and presently would appear. Shortly afterwards they did appear, so that the two daughters, Buchter and Timmer, and the old gentleman were present when the will was drafted. The plan adopted by the draftsman was ·to take testator into an adjoining room, leaving the door open and there, at a railing, testator stood for, say, ten minutes, giving Krembs (also standing) the data from which to draw the will; that thereupon they ·came back into the front office, where the two daughters and the stenographer were, and Krembs drafted the will section by section and as finished handed the sections to the stenographer who copied the same. It ·seems, according to Krembs, that though he had been notified that the father was coming he indulged in no ·conversation with the messenger as to the object of the visit. It seems that while the will was being drafted the two daughters were not consulted except as to the middle names of the children, nor did they hear the

Meier v. Buchter.

will read. That they knew its contents, however, is inferable. It seems that when the will was copied by the stenographer, Krembs, out of abundance of caution, retired with testator to said adjoining room, still leaving the door open, as we understand the record, and there, standing, read the will to him in German— from start to finish, the time used being twenty minutes. Testator assenting thereto, they again came into the front room, sat down to a table, testator signed the will, the stenographer and Krembs witnessing the will, and Krembs put it in an envelope, labeled said envelope and produced the will at probate. When testifying he did not remember that he kept the will and seems to have had an eye on drawing a will that would stand the test. On being inquired of how he came to write in the will the fact that advancements had been made to three of the children only, he explained that he received from the testator information of advancements to *all* of his children, but that fact (exercising his own volition) was not set down in the will, the record at one place setting forth as follows:

"A. I asked him why he did it.

"Q. And he gave you the reason? A. He gave me the answer, yes, *and I didn't put that answer in, of course, only stated it in the ordinary phrase.*

"Q. Well, that is what you put in the will, wasn't it? A. Yes, sir.

"Q. He told you about giving to each of them, didn't he? A. Yes, at different times.

"Q. And to each of his children? A. *All of his children.*

"Q. He told you, of course, the reason he put this in was because he wanted to make it equal? A. No. He didn't say that. *I only put that in as a precaution myself; that is, I told him whether I should put it in, and he couldn't say exactly how much he gave to each; just to say that he had given some to each already.*

197 Sup.—6

Meier v. Buchter.

"Q. What did he tell you the amount was that he had given them? A. I think the previous occasion something like fifteen hundred dollars, each of the children, I think, and I think to the oldest son even I think he had given more. That is, not on that occasion, perhaps, but in all counted together he had received more than any of the others.

"Q. But the reason he put this down was because he had given them more than the others, you say? A. *Yes; that was his idea.*

"Q. That was what he said? A. *That was what I understood from him, yes, sir.*"

On cross-examination Krembs was asked, in effect, whether he had not stated to certain parties that the will was prepared before testator appeared at his office and he testified he had not done so. For contestants, it was shown that Krembs had so stated.

On behalf of proponents it was sought to be established by Krembs that he was the business agent of testator and evidence was introduced somewhat tending to show testator was on friendly terms with Krembs, that he had known him for several years, that the old gentleman sometimes stepped into his office and discussed matters with him, such as the sale of property and investments and his troubles with tenants. But the evidence is very scanty on the score of such business relations. Krembs may have drawn a lease for him during the years of his acquaintance, and when testator's wife died in 1895 he prepared a proof of death. He never loaned any money for testator; he never sold any of his property; he collected no rents for him; and at one time got some money from one of testator's agents and turned it over to him—a mere formal matter, as we infer. But on the other hand it is not shown that testator had any regular business agent or legal adviser; and further it is shown that Krembs was the agent and business man of two of the contestees, as said, Mrs. Timmer and Mrs. Buchter.

Meier v. Buchter.

The question of the bequest to Timmer, trustee for Louisa M. Thomas, was discussed between Krembs and testator on that occasion, and in his examination in chief these questions were propounded to him and answers given:

"Q. Did he explain to you why he wanted that arranged so that it would not be placed in her hands? A. Yes sir, on account, he thought she would spend the money, likely, foolishly; and she ought to have somebody to assist her, and I asked him whether she had a guardian and he said that was not the case, and I suggested the trusteeship.

"Q. Did you ask him first whether there was a guardian for her, and he told you no? A. Yes, sir.

"Q. And this plan of the trusteeship was suggested by you? A. Yes, sir.

"Q. What did he say to that? A. He thought it was the best way out of it, as he would not like to have proceedings brought in court to have a guardian appointed. It was not necessary. She had always kept house for him; only sometimes she was a little what they call worse than at other times."

There was evidence on behalf of contestants to the effect that the day after the will was written it was given out through Mrs. Timmer and Mrs. Buchter to their sisters, contestants, and their husbands, that they had taken their father to see the doctor the day before but no inkling escaped them relating to the important visit to Mr. Krembs, and the preparation and execution of a new will were guarded as a secret, though it is not shown by this record the secret was the testator's secret, or was so considered by himself, or that the facts were locked up at his request.

There was also evidence that, when Krembs was inquired of as to those present when the will was written, he said testator was accompanied by two ladies and intimated he did not know whether they were testator's daughters or not, though it is a conceded fact

that he had long known them as the daughters of testator.

It should be said, also, that some of the testimony elicited from Louisa M. Thomas seemed somewhat improbable, but the details of that testimony go to affect her credibility, and would appear to be matter of argument and for the jury rather than for this court on questions of law, and, hence, such details may be spared.

There was also evidence by a neighbor of testator that on a certain morning, located as toward the middle of July, 1902 (but we think, by inference, it was likely the very day the will was concocted), testator came out of his door attended and supported by Mrs. Buchter; that at the gate these two were met by Mrs. Timmer; that Mrs. Buchter accosted Mrs. Timmer with "Hurry up, Bertha, you are late" thus apparently showing a prearranged meeting and a common design and mission; that thereupon these contestees, the one supporting her father on one side and the other on the other, went away with him down the street and about noon they were seen returning in the same fashion and rested their father a half block from home in a neighbor's stairway.

The foregoing statement uncovers all facts vitally necessary in considering assignments of error made, except that record facts, pertaining to the rulings of the trial court on the exclusion of testimony, will appear in this opinion in connection with the consideration of that special assignment.

I. On this record, did the learned judge presiding, *nisi*, err in forcing a verdict in favor of the will? Deferring, as we do, to his ability and ripe learning in the law, with reluctance we are forced to think he did. And this is so, because:

The large question presented touches the daughter left in penury and weighted down with infirmity. That the testator, when left to himself, felt towards this child

the attachment and responsibility arising from, and due to, her helplessness, her dumb faithfulness and his duty, this record attests in many ways. For instance, darkened as was her mind he kept her by him and under his eye and she long served him with fidelity and he ministered unto her tenderly until she was forty-two years of age. There is not a particle of proof that he consented to have her permanently taken from him or that he was aware of the purpose and significance of that act. That he, to the last, was not without affectionate delicacy of feeling towards Louisa, is further shown by the fact that he told the draftsman of the will that she had no guardian, and what he then said is fairly subject to the inference that he desired to shield her from publicity in having one appointed. To that end he told the draftsman "it was not necessary—that she had always kept house for him."

To provide for his offspring, sane and (presumably) happily circumstanced, by way of advancement in large amounts, and for some of his same offspring as legatees in other large amounts, and to put the helpless one at such great disparity, when her needs begged for fatherly justice and pity, produced a most unnatural and (we think the case allows the word) wicked will. At six per cent the trust fund created for her ($2,150) would produce an income of $129. If, now, taxes and incidental expenses be deducted, it can hardly be supposed a father, clothed in his right mind, would have considered she could subsist, let alone been supplied with the most primary comforts. Circumstanced as she was, such income could not have been intended as adequate support. If not adequate, then it was intended the principal of the fund should be drawn upon and absorbed, and, hence, further intended she should ultimately become an object of charity, i. e., a charge upon public alms.

A father may disinherit his children, young or old, well fixed in life or otherwise, and unchallenged give all

his estate to his widow; and such fact may not even call for explanation, because the broad human fact remains that the children in turn inherit from the mother and that after (or before) her wants are provided for, her motherly instincts may be trusted to distribute the estate fairly. So, too, where estrangements occur the uneven distribution of property is a natural result. Moreover, sitting as a chancellor upon the equities of his family affairs, a father may be trusted by the law to distribute his estate according to his own decree (entered *rusticum judicium.*) But in this case, how could estrangements occur between testator and Louisa Thomas? For as much as, assuming she was feeble-minded (and, hence, *pro tanto,* unaccountable),it cannot at first blush be seen how he could charge accountability to her and become estranged or take on color from her acts or conduct unless he had lost his own mental equipoise and reckoning through his own feebleness of mind or the machinations of others, operating on an enfeebled mind, and, therefore, as will be seen, this case comes within the rules of law presently pointed to.

That a testator has the naked legal right to disinherit, say, an infant of tender years left at his death a motherless orphan, is so. That is to say, such result necessarily flows from the free plenary testamentary power existing in this State under our statutes, and at common law (modified by the statutory rights of the widow and of pretermitted and posthumous heirs, if any). By the same token, a father has the naked legal right to disinherit, or substantially disinherit, a feeble-minded daughter of no earning capacity and leave her, like a falling autumn leaf, the sport of every ill wind that blows. But these general principles must be taken with some grains of salt. They are hard sayings (stumbling blocks), much murmured against. Courts have gone to great lengths in sustaining the full, abstract and concrete power of testamentary disposition; for the law recognizes that at root the idea of any tes-

tamentary power at all is grafted on the proposition that a testator has the right (and may wish) to unevenly dispose of his estate. The courts, too, recognize the evil that springs from the itching and meddlesome disposition of outsiders to make wills for others—to make a wiser distribution of their property than they have done—and have in many cases shown their inclination to check that evil by curbing that disposition, and to uphold the right of the owner of an estate to dispose of it as he elects. The courts, too, recognize the fact that testamentary disposition often comes only in the evening of life and that idiosyncrasies, foolish words, odd notions and acts. "sounding to folly" in aged people, may be so *combed* together from far and near and scheduled and paraded as somewhat to show unsoundness of mind, and yet, fairly considered in the light of every-day experience, do not establish that infirmity. However, when all this has been said it still remains that, as long as kindness is esteemed a virtue by civilized people, their laws can neither be interpreted as essentially unkind nor are they of such a sour complexion and so deadly cold in their processes as to eliminate all human warmth of sentiment and all moral duty. Accordingly, it is the sound doctrine of the law that while a testator has the abstract power of disposing of his estate by will according to his settled convictions, or caprice, yet a will, producing results such as those now under judicial scrutiny, is the object of sharp solicitude and jealously in the courts. When one of old, by subtlety, took from his brother his father's blessing and the wronged one was told thereof by his father, it is said: And when Esau heard the words of his father, he cried with a great and exceeding bitter cry, and said unto his father, Bless me, even me also, oh my father. Peradventure the law may utter for this child a cry for a blessing which her dumb lips may not utter. We think it does; because, such a will, where there is other substantial evidence of undue influence and testamen-

tary incapacity, calls for explanation and such unnatural provisions are submitted to the jury as evidence tending to show undue influence, where that is in issue, and as evidence tending to show lack of testamentary capacity, where that is in issue, and may be considered by the jury with all other facts and circumstances in the case upon such issues. That is to say, an unnatural disposition of property standing alone may not avoid a will, but the results of such unhappy distribution may be tempered and toned down, possibly to avoidance, by allowing it to be weighed by the triers of facts, along with other facts, tending to show undue influence or testamentary incapacity.

The general rule applicable to such conditions is formulated by Schouler on Wills (3 Ed.), sec. 77, thus:

"Notwithstanding the broad principle which maintains testamentary capacity, it is generally found in practice that a will which is partial and unjust in its provisions, absurd, or clearly devoid of natural duty and affection, finds no ready support in the courts. Such wills are not, indeed, absolutely void; but their execution is regarded with jealousy and suspicion. The spiritual tribunals in early times, following the Roman law of inofficious testaments, made little compunction of setting senseless wills aside, or, as Swinburne very strongly expressed it, 'if there be but one word sounding to folly.' Foolish words, foolish phrases, cannot in these days, however, be said to invalidate any will at the Anglo-Saxon law; . . . but the English law does not follow the Roman in avoiding such wills peremptorily as the offspring of incapacity, nor even so as to prevent one absolutely from disinheriting his own offspring. On the contrary, if a testator be legally competent to make his will, and acts freely, his will cannot be impeached because harsh, unequal, unreasonable, imprudent, or unaccountable in its provisions; nor as being a foolish or visionary disposition; nor even as being devoid of natural affection and moral duty. It

may be that what on the face of the will appears an unnatural disposition, may be reasonably explained. And certainly the more distant or unfamiliar one's heirs and next of kin, the less should he be expected to provide for them, equally or at all, by his testament.

"But in order to sustain any unjust, unnatural, or absurd will, which may be contested, fair proof at least should be afforded that the testator was of sufficient capacity at the date of execution to comprehend its import; and furthermore the trier of the case should believe that neither essential mistake on his part nor fraud nor undue influence of others about him produced so unhappy a disposition. . . . . In fine, a harsh and unnatural disposition by the will in question, is a circumstance which tends to discredit the maker's testamentary capacity." [See, for the same doctrine, 1 Underhill on Wills, sec. 105.]

In a very late work, Page on Wills, sec. 385, it is said:

"Under the civil law a will whereby the testator without just cause excluded from his estate those who were near to him in blood, as where a parent disinherited a child, or a child excluded a parent, was known as an inofficious will, and might be set aside by a form of contest known as *querela inofficiosi testamenti.* But the common law recognizes no such limitation upon the testamentary power of a testator who possesses testamentary capacity. . . . . However, the nature of the will itself is clearly one of the controlling facts in passing upon doubtful testamentary capacity. Popular feeling upon this point coincides with the rules of law, and the jury or the court which decides upon the facts must be allowed to consider the nature of the will in connection with the other evidence in the case." [Citing Aylward v. Briggs, 145 Mo. 604.] . . . . "If the will is unjust and unreasonable in view of the relations of the parties, this fact may be shown by proper evi-

dence, and may be considered by the jury as bearing upon testator's capacity.''

In 1 Redfield on Wills (4 Ed.), p. 516, it is said: ''Where the will is unreasonable in its provisions, and inconsistent with the duties of the testator, with reference to his property and family, . . . this of itself will impose upon those, claiming under the instrument, the necessity of giving some reasonable explanation of the unnatural character of the will.'' On p. 537: ''Gross inequality in the dispositions of the instrument, where no reason for it is suggested, either in the will, or otherwise, may change the burden, and require explanation on the part of those who support the will, to induce the belief that it was the free and deliberate offspring of a rational, self-poised, and clearly disposing mind.'' The above text has been frequently cited with approval by this court, e. g., in Gay v. Gillilan, 92 Mo. 264; McFadin v. Catron, 120 Mo. 271.

In 28 Am. and Eng. Ency. Law (2 Ed.), 106-7, the rule is formulated as follows: ''The character of the provisions, however, as being just or unjust, reasonable or unreasonable, may be considered by the jury, as tending to throw light on the capacity of the testator. Evidence is therefore admissible tending to throw light on the question of the justice or reasonableness of the will. Such evidence usually relates to the relative situations and needs of those having a claim on the testator's bounty, and to the relations between the testator and those receiving or claiming to have been unfairly deprived of his bounty.''

And in the 29th volume of the work last cited, pp. 115-16, it is said: ''Evidence that the provisions of a will are unreasonable, unjust, capricious, and unnatural is not sufficient in itself to establish undue influence (citing Campbell v. Carlisle, 162 Mo. 634); but it is proper to be considered along with other evidence as going to show such influence (citing Gay v. Gillilan, 92 Mo. 250), . . . . and for the purpose of setting out

more clearly the unnaturalness of the will it may be shown that relations between the testator and the relaatives not provided for were pleasant, or, that the lattor was dependent for support on the former.''

The doctrine promulgated in the foregoing texts may be found endorsed and circumspectly applied uniformly in our decisions. For example, in Gay v. Gillilan, 92 Mo. 264; Maddox v. Maddox, 114 Mo. l. c. 49; McFadin v. Catron, 120 Mo. l. c. 271, et seq; Catholic University v. O'Brien, 181 Mo. 68; Hughes v. Rader, 183 Mo. l. c. 710, et seq; Dausman v. Rankin, 189 Mo. l. c. 707-8; Bradford v. Blossom, 190 Mo. l. c. 139-143; Roberts v. Bartlett, 190 Mo. l. c. 700; et seq; King v. Gilson, 191 Mo. l. c. 327. And the same doctrine finds support in other appellate courts; e. g., England v. Fawbush, 204 Ill. 384; In re Will of Budlong, 126 N. Y. 423, and many others.

It is not necessary to cite authorities to sustain the proposition that undue influence need not be shown by direct proof but may be established by proof of facts from which it may be rationally inferred, nor to sustain the proposition that while fraud is never presumed, yet it may be proved by indirect evidence, as in the case of undue influence.

In our opinion there was substantial evidence below of undue influence and of testamentary incapacity, and some of the testimony, unexplained, points to fraud in the concoction of this will.

In this connection it is contended by defendants that the petition is insufficient as a charge of fraud; but the record does not show that such contention was made below, and in the absence of a motion complaining of lack of definiteness and requiring the petition to be made more specific in that particular, we are not prepared to say that the contention should be sustained.

II. Attending to the complaints made by appellants that the court erred in excluding testimony, all necessary to be said at this time is that, hav-

ing admitted some testimony of advancements to all of the children, except Louisa, prior to the execution of the last will, the court finally excluded such testimony from one witness, Mrs. Meier. The record is not explanatory on the reason for the exclusion of this testimony. In the view we take of the matter it was pertinent testimony directed to the issues of undue influence and testamentary capacity, in that it tended to show an unnatural will—its weight, of course, being greater or less under varying circumstances, and with the jury.

The learned trial judge also excluded evidence of the statements and admissions made by some of the contestees. We take it this testimony was excluded on the authority of Schierbaum v. Schemme, 157 Mo. l. c. 17, et seq. That case discussed Armstrong v. Farrar, 8 Mo. 627; Hurst v. Robinson, 13 Mo. 82; Jackson v. Hardin, 83 Mo. 186; and Von De Veld v. Judy, 143 Mo. 368, and on full consideration of those cases and the pronouncements of other appellate courts and of text-writers, announced this proposition: "We are satisfied both on reason and authority that the rule laid down in the Pennsylvania and Massachusetts cases above quoted is right and that stated in Armstrong v. Farrar, supra, whilst it is correct as applied to cases of joint interest, is no longer to be regarded as the correct rule applicable to devisees or legatees holding separate rights under a common will." (Which holding has since been followed.) [Wood v. Carpenter, 166 Mo. l. c. 485; King v. Gilson, 191 Mo. l. c. 333.] It will be seen that devisees having a "joint interest" stand on a different footing as to admissions than do those devisees who have no such interest. In this case it is not necessary to judicially interpret the phrase "joint interest." Because, under certain conditions, the rule in the Schierbaum case would not be applicable and should not be mechanically applied to the facts in this case. Here the petition alleges, in substance, that there was a

conspiracy between all the contestees to defraud, and it is elementary law that when there has been evidence tending to show a conspiracy exists, the admissions of any one of the conspirators along the line of the conspiracy, touching its subject-matter, and in furtherance thereof, are admissible. Therefore, in the retrial of this case if there should be testimony introduced fairly tending to show privity of design in the concoction of this will by the contestees, Mrs. Buchter, Timmer, Riddle and Kirchner, it is our opinion that after the introduction of evidence, if any there be, tending to the establishment of such privity of design, is introduced, the admissions of any one of the conspirators should be accepted.

We think this is as far as we ought to go, because the cause will be reversed and remanded, precluding neither party on the facts, to be tried in accordance with this opinion, and it is accordingly so orderred.

*Brace, P. J.,* and *Valliant, J.,* concur; *Graves, J.,* not sitting.