ELLA SLAGLE and ANNA RUSSELL, Appellants, v. WALTER CALLAWAY, LORENE CUNNYNGHAM, RUTH SHOFFER, JOE CALLAWAY, MRS. ELLA CALLAWAY and MRS. MAUD MAY.—64 S. W. (2d) 923.

Division One, October 19, 1933.

*Herman Pufahl* for appellants.

1056

*T. H. Douglas* for respondent.

HAYS, J.—Action in three counts; the first in partition, the second to set aside a certain deed as ineffectual on the sole ground of want of delivery, and the third to determine title. The parties waived a jury and tried all the issues to the court. The case was submitted without instructions being given or requested. The court found the issues against the plaintiffs, rendered judgment dismissing the first and second counts, finding that the deed in question was duly executed and delivered by the maker, and determining and adjudicating the title in fee to be vested in defendants Walter Callaway, Ella Callaway and Maud May in the aliquot shares set out in the judgment. From the judgment the plaintiffs appealed.

The land in controversy is the southeast quarter of the northwest quarter and the northeast quarter of the southeast quarter, all in section thirty-three (33), township thirty-three (33) of range twenty-two (22), situate in Polk County. The grantor named in the said deed was Ben H. Callaway and the grantees were Ben H. Callaway, Jr., and Walter Callaway, sons of the purported grantor, a widower. The action was instituted by Ella Slagle and Anna Russell, daughters of Ben H. Callaway, then deceased intestate, against said purported grantees together with Joe Callaway, another son, and Lorene Cunnyngham and Ruth Shoffer, heirs of a deceased daughter of the decedent Callaway; the then parties being the sole heirs at law of said decedent. Ben H. Callaway, Jr.. had died before the case came on for trial and the cause was revived as against his widow, Ella Callaway, and his daughter Maud May, his sole heirs, both of whom entered their general appearance and filed answer.

The first count was purely a statutory action in partition, the petition in substance alleging that the decedent had died owning said land, the descent cast (as stated above), the co-tenancy of the parties and the lack of susceptibility of the land of being partitioned in kind, and containing prayer for sale in partition. The second count was substantially a reiteration of the essential matters pleaded in the first count, with additional matter to the effect that said deed, of date February 19, 1916, purporting to be acknowledged on the same day, and recorded January 23, 1929,—some twenty days after the death of the decedent,—without ever having been delivered by him to the alleged grantees or any one for them; that decedent down to his death, at the age of eighty-three, had claimed to own the premises and had exercised the usual acts of ownership—stated in detail; and that the deed was a cloud upon the title of the plaintiff, which they prayed to have removed by the aid of the court in setting aside and canceling the deed. The third count alleged that plaintiffs were owners

of aliquot shares in the land; that the defendants made claim of title conflicting with plaintiffs'; that the claim of defendants was invalid because based upon said deed which, it is alleged, was never delivered. The prayer was for the ascertainment and determination of the title as among the parties to the action and for general relief. The answer, although specific in denial and averment, in effect alleged that the deed was duly executed by the grantor in his lifetime and vested the fee in the grantees at the time it was delivered to Ben H. Callaway, Jr.

The following facts and circumstances appear in the evidence: Ben H. Callaway lived upon the land many years and down to ten days before his death. Through the greater portion of that time he farmed the land himself, living alone thereon and attended by a negro cook, but toward the latter end of the period he rented out portions of the land to tenants. He paid the taxes on it, which were assessed against him, and kept the buildings thereon, including a barn built after the deed was executed, insured for his own benefit against fire. He was a patron of the Farmers State Bank at Bolivar and for years had a safety deposit box in the bank in which he kept his private papers. His son Ben kept his own papers in the same box, at the father's suggestion, but the papers of the one were kept therein separate from those of the other. It seems that the son, particularly in the later years, kept the key—there being only one key so far as the evidence shows—and usually accompanied his father when the latter had occasion to go to the bank, and often going without his father in looking after his own papers and affairs.

On January 23, 1929, shortly after the father's death, the sons Ben and Walter went to the bank and took from the deposit box the deed in question, the insurance policy covering said buildings, and a certificate of deposit made payable to the father. They cashed the certificate and filed the deed for record. They also procured a transfer to themselves, by the agent for the insurance company, of the insurance policy, Ben signing the name of his father as assignor. It appears that the father had in his written application for the policy covenanted that title to the property was in his name, and on penalty of avoidance of the policy for false answers had warranted the truth of the answers. The cash obtained for the certificate of deposit was immediately used by Ben in paying expenses of last sickness and of burial, and the remainder was redeposited in bank to the credit of the father's estate.

There was evidence that other than the farm Mr. Callaway "had no property to speak of at all." There was also evidence that the relations between him and his children were cordial, and some slight evidence to the contrary in respect of some of them, which was in turn denied. The daughters lived a few miles from the home of the father and visited him once or twice a year, and at other times in

case of his sickness. Neither they nor their husbands were ever "helped" by the father, they testified, although there were in evidence declarations of the father to the contrary.

The appellants, in the examination of their witness Austin Slagle, husband of appellant Ella, offered to show that four years previously "the witness had a conversation with Ben Callaway, Jr., in which Ben told him he had been trying to buy the land in controversy from his father and that his father said he would not sell it to him." This proffer was excluded on objection made by respondents on the ground of the wife of the witness being a plaintiff in the case and interested in the result. This witness testified, without objection, that in the same conversation just referred to Mr. Callaway "said he had his papers, deeds and tax receipts in his box in the Farmers Bank at Bolivar, and in talking about wills said he aimed for his children to share alike."

Creed Slagle, son of Austin, gave testimony, without objection made thereto, that in 1924 Callaway had a conversation with Austin in which Callaway said his son Ben was trying to buy the farm but that he would not sell it, and also said his papers were in his box at the bank and showed his key.

Appellant Ella Slagle, sworn as a witness, proffered testimony, that at the time she as administratrix of her father's estate was, at his home, making up her inventory, her brother Ben, in response to her question as to "why he was acting as he was," answered "that he was doing just what his father told him to do; that his father told him that the deed to this property was in the bank and that after his death to go there and get it from the bank and have it recorded." This evidence was by the court excluded on objections of respondents' counsel "for the reason that Ben Callaway, Jr., is now dead; that this purported conversation affects the interest of this witness and she is not a competent witness to testify to that because of the death of Ben Callaway."

The rebuttal evidence in behalf of respondents was, in effect, the following:

A. L. Pemberton said the deed was in his handwriting and he took the acknowledgment but had no recollection of what was done with the deed after it was made.

Howard Kenney, thirty-nine, lived within three-fourths of a mile of Mr. Callaway, Sr., and had known him all the witness's life. Had a conversation with him at the Callaway home in the fall of 1916 in which he told the witness he "deeded his place to Ben and Walter, his boys; he had turned the deed over to Ben and asked Ben to hold that deed until he was through with it; said nothing about Ben not having the deed recorded but he said for Ben to hold the deed until he was through." The witness left that locality in the following spring and before he left his deposition was taken. In his cross-

examination at the trial he admitted that he had previously deposed that in that conversation Mr. Callaway had told him "that Ben, Jr., was to hold the deed until after his death."

Matt Howe testified he had known Ben Callaway all his life; that twelve or thirteen years ago Callaway had come over to his place and said: "I have just filled Missouri's (his last wife's) wish; I have deeded that 40 acres of land on the north to Walter and give Ben the other on the south, and had delivered the deed to Ben. He told me a number of different times that he had made the deed and said that the deed was in Ben's possession. I talked to him about turning the place over to the boys; he said he was getting old and was going to go and live with Little Ben and was going to make them take charge of the farm, it belonged to them, that he had deeded it to them. He spoke about this a number of times, the last about thirty days before he died. In that conversation he said he was going over and stay with Ben and that the boys had to take possession of the land, that he was getting too old to look after it. He did go, took pneumonia, and died in a few days. In that conversation he said that Walter and Ben had an understanding with him how the land was to be divided."

W. R. Stinson: Knew Ben Callaway in his lifetime and had a conversation with him at his place about a deed. Had several conversations with him. At the time of the first conversation referred to witness was convalescent after an operation. Witness suggested that Callaway deed the place to Walter, that Walter needed it more than the others did. Callaway replied: "No, I am going to deed it to Walter and Ben both." When a short time after that the witness met him at Bolivar, Callaway said he had executed the deed and delivered it to Ben, already executed the deed. "On two occasions," the witness said, "he told me that he had deeded this land and delivered the deed and requested Ben Callaway not to record it until after he was dead and the fact is he wanted to live in peace with his family, that was his motive. He went on to give his reasons for deeding the farm," which reasons the witness detailed.

G. H. Dukes, who all his life had known Mr. Callaway, detailed that he and Philip Schleifer, the day before Callaway moved, met him near his home and in the conversation which ensued Callaway in connection with his mention of his intention to move to Ben's the next day, stated that he had deeded the farm to Ben and Walter in wartime. Schleifer's testimony corroborated that of Dukes.

S. R. Johnson, an attorney of many years' experience, of Bolivar, testified: He recalled a conversation which occurred at his office some fifteen or sixteen years before between himself and Mr. Callaway and in which the latter brought up the subject of the delivery of a deed. It seemed that Callaway was going to deed this land to the boys and had an idea he could make this deed and have it delivered

· after his death. The attorney ".told him like any other lawyer would that he could not do that, he would have to deliver it himself in person." After expressing his thanks for the otherwise unre- · quited counsel received, Callaway left the lawyer's office without ·having the deed drawn.

. Witness Mrs. Erwin: Having lived for seven years within a quar- ·ter of a mile of Mr. Callaway and he then being a frequent visitor in her home, she knew him well. In that period he told her on several occasions he deeded the place to Ben and Walter, because they had been good to him and he wanted them to have it. ·

· ·Walter Hook, a resident of the Callaway neighborhood for twenty years, planted in Kaffir corn a portion of the Callaway place one sea- son, saw Callaway nearly every day. On one occasion Callaway told him "that he had deeded the boys the place and delivered Ben the deed," the witness stating the reasons expressed by Calla- way.

James Watson, living a mile and a half from Callaway had known him all his life. In many conversations Callaway had told him he had deeded the farm to Walter and Ben and Ben had the deed.

Gus Wilcox, whose wife was a daughter of Callaway and the mother of respondents Cunnyngham and Shoffer, had occasion to go with Ben Callaway, Jr., to the bank for an abstract of title to certain land he was buying from Ben. The latter unlocked the safety box there and took from it the abstract.

Clint May, husband of respondent Maud May, was permitted to testify over appellants' objections based on the stated ground of incompetency on account of his being the husband of the respondent last mentioned. He stated that a few years before the trial he had a conversation with his grandfather Callaway in which the latter said he had deeded Ben and Walter the farm and had given Ben the deed. He was present on another occasion when "Little Ben" spoke to his father about "Little Ben's" getting a box to keep his own papers in. The father said that was unnecessary as both could use his box. The witness drove both men to town and to the bank. He went into the bank vault with both and when the box was opened there he saw that "Little Ben's" papers were in one end of the box · and his father's in the other end. He went with them on four oc- casions and at no time did either of the two examine the papers of the other. At another time he went with "Little Ben" to credit a payment on one Korba's note owned by Little Ben (presented to the · witness as an exhibit and indorsements identified by him thereon as · being in the handwriting of himself) and had done so on several occasions, on all of which occasions "Little Ben" had the only key to the box. The witness identified the deed in question as having been handed him by "Little Ben." That was the first time he saw the deed and at that time saw "Little Ben" put it in the box with

the rest of the papers, including the Korba deed of trust and note, and replace the box in the vault. That was in 1925 or 1926. The witness in moving his grandfather to Ben's place heard his grandfather say he was turning the place over to Ben.

George Fisher testified that on an occasion he spent the day with Mr. Callaway. They "got to talking about how children did and Mr. Callaway said, 'Well, they won't need to bother about mine. I have made a deed to this farm and turned the deed over to Little Ben.' There was nothing for them to fuss about." At another time, on being asked about making certain repairs, Mr. Callaway said: "This is good enough for me. If Walter wants to fix it better, let him fix it after I am gone. It belongs to the boys."

John Hargis testified "Mr. Callaway was talking about dying, his age and the shortness of his life remaining, and said: 'I have got my business all fixed, so that after I go it will be all right. I have plenty of money in the bank to bury me. I have given everything to Little Ben and Walter.'"

It seems that the respondents were in possession of the land at the time of the institution of the suit.

■ The correctness of certain propositions of law as laid down by the appellants will be conceded. These are (1) assessment of property is evidence of ownership (Johnston v. Johnston, 173 Mo. l. c. 104, 73 S. W. 202, and other cases); (2) payment of taxes is evidence of ownership (Woodside v. Durham, 317 Mo. 15, 295 S. W. 772); (3) in order to constitute delivery the grantor must divest himself of all dominion over the deed, and unless this is done there is no delivery under the law (McCune v. Goodwillie, 204 Mo. 306, 102 S. W. 997), and the delivery of the deed is not complete until it is accepted by the grantee. |Brooks v. Johnson, 199 S. W. 204.]

■ This leaves but three questions for determination, of which the first is the question of admissibility of the proffered testimony of appellant Ella Slagle.

The statute which governs in the situation provides:

"No person shall be disqualified as a witness in any civil suit or proceeding at law or in equity, by reason of his interest in the event of the same as a party or otherwise: . . . *Provided,* that in actions where one of the original parties to the contract or cause of action in issue and on trial is dead, . . . the other party to such contract or cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under him, and no party to such suit or proceeding whose right of action or defense is derived to him from one who is, or if living would be, subject to the foregoing disqualification, shall be admitted to testify in his own favor, except as in this section provided." [Sec. 1723, R. S. 1929.]

The contract in issue was the deed; the cause of action was the validity *vel non* of the deed. Ella Slagle, though not a party to the deed or contract, was not only a party to the suit but also derived her right of action from her father Ben H. Callaway, who was a party to the contract in issue. The question is, then, whether she was disqualified to testify by reason of the death of one of the grantees in the deed, viz., Ben H. Callaway, Jr. The testimony she offered to give was material, for if believed it bore on the issue of delivery and in one view had a tendency to disprove delivery of the deed. Counsel for respondents insist she was disqualified, citing and relying on the statute just quoted and upon Eaton v. Cates, 175 S. W. 950, 953; Davis v. Robb (Mo. App.), 10 S. W. (2d) 680, 681; and Elsea v. Smith, 273 Mo. 396, 407, 202 S. W. 1071.

The first cited case was decided on facts in nowise similar to those of the instant case; the contract in issue in that case was between but *two* persons, one of whom was dead when the testimony of the other was offered. Davis v. Robb, supra, was an action on a promissory note executed by two makers and indorsed by a third person. The note was made to two payees, husband and wife, and transferred to the wife by the husband. After the death of both spouses the action was brought by the wife's administrator against the makers and the indorser. The issue was whether the name of the indorser was added to the note after the completed execution by delivery. The indorser and one of the makers were offered, and held to be incompetent, as witnesses. That ruling of the trial court was on appeal held to be correct. The case of Elsea v. Smith, supra, is no nearer to being in point than the two cases just referred to. On the question of admissibility of evidence it rode off on the form of objections interposed to the evidence.

With respect to admissions against interest made by Ben Callaway, Jr., Mrs. Slagle is in the same position that her father would have been in had he been alive at the time of the trial and offering to testify to admissions of that character made to him by his son Ben. In other words, she derives her right of action from her father and is therefore under the same disability by force of said statute. The exact question presented in this record has not heretofore, so far as we are advised, been squarely decided by this court. For that reason, and not because in the view we take of the case the solution of the question is essential to our determination of the case, we shall undertake to resolve it.

In support of admissibility appellants cite and rely upon Fulkerson v. Thornton, 68 Mo. 468, and Wahl v. Cunningham, 320 Mo. 57, 6 S. W. (2d) 576, which hold that "Where the contract sued on was made on the one side by two persons, one of whom has since died, that fact does not disqualify the adverse party from testifying in the case." It appears from an examination of these cases, and many

other cases intervening between them, in which the rule is stated or applied, that the rationale of this line of authorities is that two parties on one side of the contract were in joint interest. The rule as to the admissibility of admissions of a party in joint interest was first laid down by our court in Armstrong v. Farrar, 8 Mo. 627. [See Schierbaum v. Schemme, 157 Mo. 1, 1. c. 21, 57 S. W. 526.] In the later case of Railway Co. v. Fowler, 142 Mo. 670, 44 S. W. 771, a proceeding for assessment of damages in condemnation of real estate, the defendants were co-tenants in common of the land affected. It was there held that an admission against interest by one of the defendants would not bind the other had the other not waived the point by entering into a certain stipulation recited. The principle involved in that ruling, while approved as applicable to joint interests, was held in Schierbaum v. Schemme, supra, to be inapplicable to devisees or legatees holding separate rights under a common will. In the subsequent case of Adair v. Kansas City Terminal Railway Co. et al., 282 Mo. 133, 1. c. 150-154, 220 S. W. 920, we reviewed the cases referred to supra and also Meier v. Buchter, 197 Mo. 68, 94 S. W. 883, pointing out that in the Schierbaum case "Judge Valiant recognized the fact that the contest involved the existence of the will, so that whatever might be the result, it carried with it the interest of all beneficiaries without regard to their privity of interest or design. . . ." We there further said: "This court again made this distinction in Meier v. Buchter, 197 Mo. 68, a suit 'to set aside the will . . . charging undue influence and fraud —the product of a conspiracy between proponents—and testamentary incapacity.' In that case the trial court had excluded testimony of statements and admissions made by some of the contestees. This court, after quoting Schierbaum v. Schemme, supra, said: 'It will be seen that devisees having a "joint interest" stand on a different footing as to admissions than do those devisees who have no such interest. In this case it is not necessary to judicially interpret the phrase 'joint interests.' Because, under certain conditions, the rule in the Schierbaum case would not be applicable and should not be mechanically applied to the facts in this case." The court reversed the case on other grounds and directed that in view of the charge in the petition of conspiracy, if on a retrial there should be testimony fairly tending to show privity of design in the concoction of the will by the contestees, the testimony of any one of the conspirators should be accepted. And speaking to the doctrine of admissions of one partner against all, the court concluded 1. c. 153: "In such case the interest of each is identical. It extends not only to the entire recovery, but covers the entire ground of liability. The same identity of interest existed in Railway Co. v. Fowler, supra, only by agreement made for the purpose of trial, and the same principle was applied. In Meier v. Buchter, supra, the interests of the parties were

several and not joint, but the *cause of action* lay in conspiracy to commit a fraud, which required 'privity of design' to support it, and the rule was applied upon that ground.''

The stipulation set out in the Fowler case and referred to in the Adair case was one by which it was agreed between defendants that the property owned by them at the time of the trial was, when the suit was begun and down to a certain date, owned by one Rothan and one Goldsmith, as tenants in common, and was further agreed, that one-half of the total damages to the land should be assessed in favor of said Rothan and the other half in favor of the executor of Goldsmith. We are unable to perceive how the stipulation could have the effect attributed to it in the Fowler case, wherein it is stated that ''the legal effect of the stipulation was that each party waived all objection to evidence which was admissible against the other. The parties placed themselves in the position of joint owners in respect to the damages to be assessed and at the trial should not have been permitted to *shift* their position, and claim damages as tenants in common, in order to prevent the introduction of evidence which would be competent if the ownership was joint. We do not think defendants can complain, though the admissions of Rothan, in the absence of the stipulation, would not have been admissible against the other defendant.''

The reasoning which led to the conclusion announced seems unsound. Under settled rules of procedure in relation to trials the damages to be assessed in condemnation proceedings are required to be assessed by commissioners or by a jury, as the case may be, *in solido* in favor of *all* owners of the lands in suit or of right and interest therein. The rights and interests of the landowners *inter sese* are not a proper subject of inquiry or for consideration either by commissioners in making their assessment or by a jury upon the trial. The duty rests upon the court, after such assessment is made, to apportion among the owners in accordance with their respective rights and interests, the damages so assessed. The testimony of any witness given in behalf of the landowners on the subject of damages would necessarily inure alike to all, irrespective of the stipulation, which also, as we regard it, had no effect upon the action of any party with reference to his right to develop evidence upon the issue of damages. The stipulation was wholly without effect upon the tenancy in common as it then existed, and operated only to divert one-half of the damages to the executor when so assessed and apportioned. So, we are constrained to say, the ruling in this respect as made in the Fowler case is out of harmony with the long course of our decisions and is disapproved. Therefore, under the long-established rule of this court it was not error upon the part of the trial court to exclude the proffered admission of Ben Callaway, Jr.

But not so in respect of the admissibility of Austin Slagle's proffered testimony touching the admission of Ben Callaway, Jr., viz., "that he had been trying to buy the land from his father and that his father said he would not sell it to him." It was error to exclude this testimony. Regarding this, the statute (Laws 1921, p. 392, present Sec. 1728, R. S. 1929) makes Slagle a competent witness for his wife and renders his testimony admissible if it does not (and it did not) relate to confidential communications between him and his wife. [Hughes v. Renshaw, 314 Mo. 95, 282 S. W. 1014.] The same may be said of the admissibility of the testimony of Clint May; it was not improperly admitted.

The respondents cite numerous authorities which state generally or apply the rules of law pertaining to delivery of the deed. We consider it unnecessary to consider in detail any of the authorities cited by respondents or appellants. Among respondents citations the following are representative and illustrative: The primary rule is that the question whether there was a delivery of the deed is to be determined in this case, as in each case, by consideration of all the facts in the particular case, the relation of the parties and all the circumstances in evidence. [Gillespie v. Gillespie (Mo.), 289 S. W. 579.] Delivery to one or more grantees is sufficient as to all unless a disclaimer is shown. [18 C. J. 212, par. 117.] "The delivery of a deed so far as the grantor is concerned is a matter of intention, and where the intention clearly appears the act in pursuance thereof will be construed to constitute a delivery." [Coulson v. Coulson, 180 Mo. 709, 715, 79 S. W. 473.] And whether a deed—delivered by placing it in the grantee's manual possession or control, or so delivered to another person for him,—was delivered within the meaning of the law so as to pass the title, depends upon whether the grantor at the time intended to divest himself of title and control over the deed and delivered it without right of recall. [Mendenhall v. Pearce, 323 Mo. 964, 20 S. W. (2d) 670.]

But before applying the rules of law proposed by the respective counsel, and accepted, consideration should be given as to whether the proceeding is at law or in equity as determining the proper limits of our review of the evidence. Notwithstanding each counsel has briefed and argued the case on the apparent assumption it is in equity, whether it is or not is to be determined from the pleadings. From the synopsis given of the petition in an early paragraph of this opinion it appears that the second count was in equity, seeking to remove an alleged cloud upon the title of the appellants and containing a special prayer for the removal thereof by the annulment and cancellation of the deed. This count remained in the case and became *res adjudicata* as included in the final judgment and decree. The situation is much the same as if the allegation and special prayer had been, as it might properly have been, contained in the

count for determination of title. We think that special matter was of cognizance in equity and converted the case into one in equity. [Jacobs v. Waldron, 317 Mo. 1113, 1138, 298 S. W. 773.]

The only question remaining is whether the decree was for the right parties. The evidence in the case was largely oral. The trial judge with opportunity to observe the witnesses and their manner, their interest or otherwise in the result of the trial, their bias and prejudice, if any, and all the minutiae of the trial, was in a position superior to ours to determine the credibility of the witnesses and to estimate the probative value of their testimony. For that reason we defer largely, though not entirely, to his findings and judgment in the case.

Evidently the trial judge reached the following conclusions which were permissible under the facts and circumstances: That the deed was actually delivered into the manual possession of Ben H. Callaway, Jr., accepted by him and placed in the box with the papers of his father, who had access and might have regained possession of it, and that that fact did not have the effect to destroy the instrument as a completely executed deed (Terry v. Grover, 235 Mo. 544, 139 S. W. 337; Sneathen v. Sneathen, 104 Mo. 201, 16 S. W. 497), and would not, even though the arrangement was that the instrument should not be placed of record until the father's death, and notwithstanding the father should have the use and proceeds of the property until his death. [Headington v. Woodward, 214 S. W. 1. c. 963.] That the deed being of such a character that it warranted a presumption of acceptance by Walter Callaway, because it carried a benefit to him—a presumption supported by an inference of knowledge on the part of Walter of delivery, in view of the relationship of the parties as well as the declarations of his father that seemingly were numerous and widely current. Also his acceptance was accomplished later, if not thus before, by his taking the deed and filing it for record, which under the doctrine of relation became an acceptance as of the time the instrument was actually delivered to his brother Ben. [White v. Pollock, 117 Mo. 467, 1. c. 472-473, 22 S. W. 1077 (and cit.), in which the grantor had also carried insurance in his own name on the property.]

After full consideration of the facts and principles of law applicable thereto, we approve the findings of the court below and affirm the judgment and decree. All concur.