**W. A. O'MOHUNDRO, Respondent,**

Josephine Leonora O'Mohundro, Dulcie Berr, and Laura Porterfield, Substituted Respondents,

v.

Eva MATTINGLY, Wiley Leon Mattingly, Leahman Lavell Mattingly, Jeanetta Mattingly, Patty Lovenia Lee, Nancy Lee, Robbie Lee, and Clarence Lynn Mattingly, Appellants.

No. 48588.

Supreme Court of Missouri,

Division No. 1.

Jan. 8, 1962.

Motion for Rehearing or to Modify Opinion Denied Feb. 12, 1962.

Elvis A. Mooney, Bloomfield, and Hyde & Purcell, Poplar Bluff, for appellants.

Powell & Jones, Dexter, for respondents.

WESTHUES, Presiding Judge.

This suit was filed in Stoddard County, Missouri, to set aside two deeds. One deed conveying approximately 195 acres of land was dated July 16, 1940, and the other conveying approximately 37 acres was dated February 6, 1943. All of the land was situated in Stoddard County. Each deed was executed by W. A. O'Mohundro, a single person, and the grantees in each deed were Eva Mattingly and the heirs of her body. Eva was a niece of W. A. O'Mohundro. The ground upon which it was sought to set aside the deeds was nondelivery. The trial court granted the relief prayed for and the defendants appealed to this court.

The suit was filed by W. A. O'Mohundro and the defendants named in the petition were Eva Mattingly, her children, Wiley Leon Mattingly, Leahman Lavell Mattingly, Patty Lovenia Lee, and Clarence Lynn

Mattingly, and Eva's grandchildren, Jeanetta Mattingly, Nancy Lee, and Robbie Lee. While the case was pending in this court, plaintiff W. A. O'Mohundro died and on motion Josephine Leonora O'Mohundro, plaintiff's widow and executrix of her husband's estate, Dulcie Berr, and Laura Porterfield, beneficiaries in a will of W. A. O'Mohundro, which was filed for probate in Butler County, Missouri, were substituted as parties plaintiff. Hereinafter we shall refer to the original plaintiff as W. A.

For a better understanding of the case, we shall relate some of the history of the relationship of the parties involved in this controversy. In 1911, the defendant Eva, then only a few months old, was taken into the home of W. A. and his wife Rachel. Eva was a daughter of W. A.'s brother Jim. Her mother died a short time after Eva's birth. W. A. and Rachel reared Eva as though she were their own child. They had no children of their own. Eva married when she was about eighteen years of age. Rachel, W. A.'s first wife, died in 1939. W. A. married for a second time in 1945. This second wife was a widow with children. Prior to this second marriage, W. A. executed the two deeds in question by which two tracts of land were conveyed to Eva and the heirs of her body. The deeds were kept at the Bank of Fisk of which Marshal Shain was president. W. A.'s business at the bank with reference to the deeds seemed to have been transacted with Shain. In February, 1943, W. A. executed a will giving the land described in the deeds to Eva and the heirs of her body. This will was kept at the bank.

The disputed issue in the trial of the case was whether the deeds were ever delivered to Eva. W. A. contended that there was no delivery while Eva claimed there was delivery. W. A. admitted that he executed the deeds in question and further that he executed a will bequeathing all of his property to Eva. He stated, however, that he at no time delivered the deeds to Eva or authorized anyone else to do so. W. A. claimed that he kept his papers in a trunk at home until 1945 when he took the deeds to the Bank of Fisk and handed them to Shain or someone at the bank for safe keeping. He further stated that he did not rent a deposit box at the bank until 1950; that before that year, and after 1945, his papers had been kept in the vault at the bank; that in 1950, he rented a box and was given two keys which he kept hanging on a nail in a bedroom at home. He claimed he at no time gave a key to Eva and that Eva never saw the deeds until she removed them from the lock box while he was seriously ill on September 11, 1952, and on the same day had them recorded. It was admitted that Eva did remove the deeds from the safe deposit box on that day and that she had them recorded. Eva claimed that W. A. authorized her to take the deeds and have them recorded. W. A. testified that he did not do so. More of this later. Eva testified that in 1944, before W. A. (called "Pa Arno" by Eva) married a second time, he took her to the Bank of Fisk and in the presence of Marshal Shain the following occurred:

"A Pa Arno told me that he had made me deeds to his property, and that he wanted me to come and go with them and take the old deeds and look them over to see positively that they had the same quotations.

"Q You mean the description of the land was the same?

"A Yes, sir.

"Q Was that done?

"A Yes, sir.

"Q And who did it?

A Me and Pa Arno and Marshal Shain went in his office and searched them out.

"Q Searched them out of what?

"A From the old deeds onto those.

"Q Did he have them in the bank or in the lock box?

"A In the lock box.

"Q Was there anything else in the lock box at that time?

"A Yes, sir, the abstracts, I had bonds in there, he had bonds in there, and my will he had made me before he made the deeds.

"Q Now, at that time did he ever hand these deeds to you?

"A Yes, sir.

"Q Tell the Court what he said to you.

"A After we had looked them over he said to Mr. Shain, 'Marshal, I am giving Eva these deeds and whenever I'm dead she don't need to administer or no lawyer to tend to her business.'

"Q What did you do with the deeds?

"A I took them and put them in the locker box and locked them back up.

"Q Did you do anything with the other deeds and the abstracts and things?

"A Just left them in the box.

"Q Did you put them in the lock box, too, where these were?

"A Yes, sir.

"Q Now, how many keys were there to this lock box?

"A Two.

"Q Now, tell the Court who had the keys?

"A Pa Arno had the keys up until '45.

"Q That is about the time you're telling the Court about?

"A He gave me my deeds in '44. He gave me those deeds in '44, and he went with me to the bank.

"Q You say in '45 then he gave you—

"A A key.

"Q Is this the key?

"A That is the key, yes, sir."

In some respects Eva's evidence just quoted was corroborated by W. A.'s witness Marshal Shain. Note that W. A. claimed he did not rent a box at the bank before 1950 and that Eva did not see the deeds before 1952. Marshal Shain testified on cross-examination as follows:

"Q Mr. Shain, they had a lock box at the time when the first Mrs. O'Mohundro was alive, did they not?

"A I think so, but I don't remember the date they took out a box.

"Q In any event, they had had a lock box before 1952?

"A Yes."

Shain was not positive as to what occurred with reference to the use of the deposit box. He stated that the records were lost as to any matters before 1952 when the bank was moved from one building to another. About Eva's using the box, his evidence was as follows:

"Q (By Mr. Mooney) Do you know whether or not she ever used one of the keys to get in the lock box at any other time besides on September 11th?

"MR. POWELL: You mean before that date?

"MR. MOONEY: I mean before.

"THE WITNESS: I don't—it seems to me as if she did, but I couldn't be positive.

"Q (By Mr. Mooney) You would not tell the Court that she did not use the lock box?

"A No, I wouldn't tell that she did not."

With reference to W. A. and Eva's being in the bank to examine the deeds, Shain testified as follows:

"Q Now, do you recall at any time after you wrote this deed, which is Defendants' Exhibit 1, do you recall

Mr. O'Mohundro and Mrs. Mattingly being there when they checked the descriptions of the deeds with other deeds in your presence?

"A   Yes, sir.

"Q   And do you know what happened on that occasion?

"A   No. I don't remember.  I know they came in and looked at some deeds in my office, and I don't remember the conversation even.

"Q   But at that time the deed which you had written and the deed which Mr. Arnold had written was laid on the desk and prior deeds to that land was checked with your help to see whether they actually conformed to the description?

"A   That's right.

"Q   And Mr. O'Mohundro and his daughter had conversation there at the bank, all of which you didn't hear, too, didn't they?

"A   I don't remember, I don't remember the conversation.

"Q   Do you remember whether Mrs. Mattingly had the old deeds and the new deeds and abstracts in her hands at that time?

"A   No, I don't.

"Q   You were all three there together and had these two deeds and other deeds there with you?

"A   Yes.

"Q   Now, that was before 1952, September 11th, wasn't it?

"A   Before that?

"Q   Yes.

"A   Yes."

W. A. testified that this occurred in 1957 after the deeds were recorded.  Eva testified that W. A. had given her a key to the lock box as far back as 1945 and that she had used the box to deposit war bonds in her name and others in W. A.'s name.

Note W. A.'s evidence as to the reason he had made the deeds:

"Q   Mr. O'Mohundro, what would have been the purpose now at that time of making this second deed after the will was made?

"A   When I made the second deed?

"Q   Yes.

"A   Well, I had a couple of brothers that I knowed would try to break that will and get that land, that's why I made the deed.

"Q   You made the deed on the 6th day of February so that from that time on your brothers couldn't take the land away from Eva?

"A   Yeah, that's right, or have any trouble."

In September, 1952, W. A. went to a hospital in Poplar Bluff and underwent surgery on September 5.  He was very ill and not expected to live.  Before he went to the hospital, he went to see M. W. Henson, a lawyer at Poplar Bluff, to have some papers changed.  W. A. was ill at the time. The purpose of this visit to Henson was left in doubt.  Note W. A.'s evidence:

"Q   When you talked to Mr. Matt Henson did you give any instructions as to what you wanted to do about your property?

"A   No, he didn't have time to talk to me.  I did tell him, I did tell him—he asked me where those papers was I wanted changed, and I told him in the Fisk Bank, and he said, 'Well, go over there and get your papers and bring them over and we'll just fix it like you want it.'  He said, 'I've got to go, I ain't got time to talk to you.' "

W. A. never saw Henson again before he went to the hospital.  While W. A. was at the hospital on September 11, a brother of W. A. or Eva called Henson and asked him to come to the hospital for the purpose of

writing a contract. This contract signed and executed by Eva as party of the first part and W. A.'s wife, Leonora, as party of the second part was prepared by Henson at the hospital and signed by the contracting parties. Each party was given a copy thereof. In this contract, the two deeds here in question were referred to and were described with particularity. After such description, the contract continued as follows:

" * * * which said deeds have been delivered to the said Party of the First Part and which said land described in said deeds has been until the date of this agreement held by the said W. A. O'Mohundro with the right to use, occupy and enjoy the proceeds therefrom, and by mutual agreement between the said W. A. O'Mohundro, the maker of said deeds, and Eva Mattingly, the Party of the First Part herein, the said W. A. O'Mohundro was to enjoy the use, occupancy and control of all of the land described in said deeds during the remainder of his natural life.

"It is agreed and understood by and between the Party of the First Part and the Party of the Second Part that the said W. A. O'Mohundro is now seriously ill and a patient in the Poplar Bluff Hospital at Poplar Bluff, Missouri, and this contract is made between the parties hereto to avoid any misunderstanding or disagreement in the event of the death of the said W. A. (Arno) O'Mohundro. It is agreed by and between the parties hereto that in the event of the death of the said Arno O'Mohundro during the year 1952, that the Party of the Second Part shall have all of the 1952 crop grown and harvested from the land described in the deeds hereinabove mentioned, and the Party of the First Part will pay to the Party of the Second Part the sum of Five Hundred Dollars ($500.00) per annum for five (5) years, totalling the sum of Two Thousand Five Hundred Dollars ($2500.00) in the event the Party of the Second Part does not depart this life prior to the expiration of the term of said payments; said payments to be made semi-annually $250.-00 on or before the 31st day of July, 1953, and Two Hundred and Fifty Dollars ($250.00) on or before the 31st day of December, 1953, and Two Hundred and Fifty Dollars ($250.00) on or before the 31st day of July and the 31st day of December of each year thereafter until the total sum of Two Thousand Five Hundred Dollars ($2500.00) has been paid, provided that in the event of the death of the Party of the Second Part before said sum of Two Thousand Five Hundred Dollars ($2500.00) is fully paid, that no further payments shall be required to be made by the Party of the First Part.

"In consideration of the payments to be made by the Party of the First Part to the Party of the Second Part as hereinabove specified, the Party of the Second Part covenants and agrees that she will not in any manner contest the right of the Party of the First Part to the possession, ownership, control and emoluments to be derived from the land described in the two deeds hereinabove mentioned; * * *."

On the same day, September 11, after the above contract was signed, Eva went to the bank and obtained the deeds and had them recorded. W. A. left the hospital on September 21. He was informed by Eva that she had had the deeds recorded. W. A. was also told of the contract and discussed the terms thereof with his wife and Eva. W. A. testified that he did not want the deeds recorded; further, that it was his desire for his wife to have $2500 in cash and also to have the 37–acre tract of land. W. A. testified that about five or six weeks after he left the hospital, he had a discussion with his wife about the contract. Note his evidence:

"Q Now, I will ask you if at about that same time you and your wife

didn't read this contract right here together in your home?

"A   My wife read that to me in about five or six weeks—

"Q   After you came home?

"A.   Yes, sir.   She got it and come to me with it and said, 'Arno, I didn't get what I thought I was going to get, what you told me I was going to get.' I said, 'Well, read it.' I took it and couldn't read it, couldn't see it.

"Q   What had you told her she was going to get?

"A   I told her, and we come to an agreement on it, that she would get the little place on the road and $2500.-00, that's what I told her."

He testified that at various times he attempted to have Eva "fix it up" and that she always promised to do so until about 1957.   Eva denied that she agreed to transfer the 37-acre tract to W. A.'s wife.   She stated that she went to see a lawyer; that this lawyer advised her, in substance, that since the deeds were recorded a retransfer by her would not clear the title; that the provision in the deed to "the heirs of her body" meant that Eva had only a life estate.   Eva testified that thereafter she informed W. A. she would not sign any more contracts.   This suit was filed on April 30, 1958.   W. A. testified that Eva told him that he did not have a life interest in the land and that she was claiming the rents; that that was the reason he brought this suit.

Eva denied that she claimed the rents from the land and testified that while she and her husband were living on the property they paid rent to W. A.   She further testified that it was understood between her and W. A. that he, W. A., was to have the use of the land as long as he lived.   W. A. admitted that he had collected all of the rents up to the time this case was tried.   It was in evidence that W. A. spoke to the assessor about having the property assessed in

Eva's name but that since he was to have all the rents he would pay the taxes.   Insurance policies on the property were likewise changed showing Eva to be the owner.   In 1956, the deposit box at the bank was placed under the name of Eva Mattingly and thereafter she retained both keys to the box.

On February 1, 1958, only two months before W. A. filed this suit, he received a letter from an insurance agency in answer to an inquiry he, W. A., had made about the insurance on one of the houses.   In this letter, W. A. was advised that the agency had no record of insurance in W. A.'s name. To this letter, W. A. dictated the following reply written in longhand:

"Mr. Trammel—
"You say you can't find where I ever had any insurance with you—It's strange that you can't find it now—as I have had a policy on the house North of Fosters Store for over thirteen (13) years and it seems as tho when the payment of said policy came due those 13 years it could always be found and as far as that the title has been changed to Eva Mattingly and as for *that* I have a life time dowry on the place will (?) control as long as I live and I am very much alive yet—and I have the proof that I did have a policy there and have the cancelled checks that I sent you as payment on said policy and I also wrote you when I went to renew my policy and told you the title had been transferred to Eva Mattingly and I ask you if it would be legal to take the policy out in my name—Mrs. Mattingly tells me she consulted a lawyer and he told Her the policy was not legal and I could not collect on it if that is true—I had no protection—but you had taken my money any how—so now I'd like a refund of it.
                    "Arno Omohundro
                        "824 N. D St.
                            Poplar Bluff.   Mo."

W. A. testified that in 1957 his wife went to see lawyer Henson who had prepared the contract signed by her (his wife) and Eva and consulted the lawyer about her rights;

that she was told the contract had run out. In other words, under the terms of the contract there was no obligation on Eva to pay any sum to W. A.'s wife. No payments were ever made on the contract. Eva testified the purpose of the contract was to make some provision for W. A.'s wife for five years in case W. A. died during 1952; that after five years, the wife would be entitled to social security. Mrs. W. A. was sixty-six years old at trial time which was July 8, 1960.

There was a sharp dispute with reference to a letter claimed to have been signed by W. A. on September 11, 1952, authorizing the bank to permit Eva to take papers from the lock box. Eva claimed the letter was typed by Mr. Henson. Mr. Henson denied that he typed the letter. It was written on Henson's stationery. There was evidence that W. A. signed the letter and evidence that he did not. Furthermore, there was evidence that W. A. was not able to sign a letter on that day and, if he had, he would not have been conscious of having done so. The letter and the circumstances under which Eva obtained the deeds on September 11 make it difficult to determine just what occurred on that day. However, a consideration of the contract signed by Eva and Mrs. W. A. O'Mohundro, the terms of which were later discussed by all of the parties (including W. A.) and the actions and conduct of W. A. with reference to the assessments of the property for tax purposes and to the insurance renders immaterial just what did occur on September 11 as to how Eva obtained the deeds. There was clearly a ratification of Eva's action of recording the deeds. In fact, the only substantial objection voiced by W. A. was that he wanted his wife to have the 37-acre tract in addition to the $2500. Cleary v. Cleary, Mo.Sup., 273 S.W.2d 340, 1. c. 347 (15).

■ The burden was on W. A. to prove nondelivery. 26A C.J.S. 14 Deeds § 183; Galloway v. Galloway, Mo.Sup., 169 S.W. 2d 883, 1. c. 888(16, 17). See Cleary v. Cleary, supra, 273 S.W.2d 1. c. 346(5–9), where this court stated that "The essence of delivery, and the controlling element, is the grantor's intention, which may be manifested by words or acts or both; and where, as here, the case turns upon the question of whether there was a delivery, the burden of showing nondelivery rests upon the party who seeks to invalidate a deed upon such ground."

■ Delivery of a deed may be made so as to pass title even though the grantor retains possession of the deed. It is the intention of the parties, especially that of the grantor, which controls. In the Galloway case, supra, 169 S.W.2d 1. c. 888(10–15), this court said, "The delivery of a deed is not rendered ineffectual by the placing of it by grantee in a safety deposit box, or other place of safekeeping, to which both the grantor and grantee have access. Slagle v. Callaway, 333 Mo. 1055, 64 S.W.2d 923, 90 A.L.R. 1366; Phillips v. Phillips et al., 50 Mo. 603. Nor is the delivery of a deed rendered ineffectual if the deed is given into the custody of the grantor for safekeeping. Hale et al. v. Weinstein et al., Mo.Sup., 102 S.W.2d 650." See also Baker v. Baker, 363 Mo. 318, 251 S.W.2d 31, 1. c. 37(10, 11), 33 A.L.R.2d 1431.

■ In the case before us, the grantor named in the deeds testified that he had executed a will bequeathing the property in question to Eva and fearful that "a couple of brothers that I knowed would try to break that will and get that land, that's why I made the deed." If there was no delivery of the deeds, the purpose in making the deeds to protect the will and Eva would not have been effected. Eva's testimony that W. A. handed the deeds to her at the bank with the statement that "I am giving Eva these deeds and whenever I'm dead she don't need to administer or no lawyer to tend to her business" is entirely consistent with W. A.'s intention as he testified. The banker, by his evidence, supported Eva's version. The banker was W. A.'s witness.

It is our opinion that W. A. failed to prove his case by a preponderance of the evidence and that the evidence was insufficient to support a decree of cancellation.

The judgment of the trial court is hereby reversed and the cause remanded to the trial court with directions to set aside the judgment entered and to dismiss the petition. It is so ordered.

All concur.