**Jessie SHROYER, Respondent,**

v.

**J. Wesley SHROYER and Wayne Shroyer, Appellants.**

**No. 52943.**

Supreme Court of Missouri,
Division No. 1.

March 11, 1968.

Brown & Pyatt, by, Robert F. Pyatt, Trenton, for plaintiff-respondent.

Pickett, Andereck & Hauck, by, Marvin L. Sharp, Eugene E. Andereck, Trenton, for defendants-appellants.

HOUSER, Commissioner.

Bill in equity to cancel a warranty deed on the ground of nondelivery and for an accounting of royalties received from the operation of a stone quarry on the land, an 80-acre farm in Mercer County. Plaintiff is Jessie Shroyer, mother of the defendants J. Wesley and Wayne Shroyer. The trial chancellor cancelled the deed and ordered the grantees to pay $1,392.82 in royalties. Defendants appealed.

The common source of title is Jennie Peters, a widow, who acquired the farm by deed in 1935. Jennie's brother, Virgil Shroyer, helped her run the farm for many years, until his death in July, 1960. At the time of Virgil's death Jennie's family consisted of her brother George Shroyer and his wife Beulah; Virgil's widow (Jessie Shroyer, plaintiff herein), and Jessie's five daughters and two sons (Wayne and Wesley, defendants herein). On October 15, 1960 Jennie made and executed a will, properly witnessed, leaving the 80-acre farm to Virgil's widow, Jessie Shroyer, reciting that Virgil had kept up the farm for 30 years and that Jessie, his wife, "has been more than a sister to me in that time and all without compensation of any kind." (At that time Jessie owned or had an interest in farms totalling 663 acres, and a house in Mercer, subject to a mortgage of between $10,000 and $11,000, facts of which Jennie was aware.)

Jennie Peters was a strong-willed woman with a mind of her own. "You just didn't tell her what to do." She was generous with her relatives and from time to time made gifts to or paid bills for them. She gave one of her nieces $500 when the niece's husband died. She gave Wesley Shroyer $240 to pay for new dentures. She was "in the habit of making up deeds" and would dispose of her property, change her mind and make another disposition of her property, then change her mind again. In the six years before her death she made three different dispositions of her property. Jennie preferred secrecy about her property affairs and wanted to keep peace in the family. After executing the will dated October 15, 1960 Jennie turned it over to her niece Betty Daily with the request that Betty put it in her bank box and "not ever say anything about it." Jennie said she thought it would "keep down trouble in the family" if nobody knew about it. The will remained in Betty's safety deposit box in Peoples Bank of Mercer until Jennie died. After giving Betty possession of the will Jennie did not thereafter discuss the will with Betty, or request of Betty that she return the will or destroy it. After Virgil's death Wayne and Wesley would come out to Jennie's farm about once a week. They would chop ice and perform other chores, such as throwing hay down for the cattle, cleaning out the barn, repairing fences, etc.

Robert and Rachel Jones were close neighbors with whom Jennie had almost daily discussions about her business. For a period of 3 or 4 months prior to December 1, 1964 Jennie discussed with the Joneses the deeding of the 80-acre farm to Wayne and Wesley Shroyer. She stated

that she wanted to deed the property to them; that "she wanted Wayne and Wesley to have the farm and that was her intentions." Jennie told the Joneses during this period that Betty Daily (sister of Wesley and Wayne) had asked Jennie to deed the farm to her since she (Betty) was the one who was taking care of her mother Jessie, but that Jennie had refused to do so. Robert Jones suggested that Jennie get a lawyer to prepare the deed but she wanted him to prepare it, so finally he "gave up" and he and his wife prepared the deed. Jennie made it known to Jones that the purpose of preparing the deed was "to pass title before she died so it wouldn't be probated as a part of her estate." Jones explained that Jennie was "a saving sort of person" and that she did not want too much property to "go through Probate Court." When asked whether she had any other papers "out" Jennie answered that all of her papers had been brought back to her and "everything was destroyed"— that there was no will or "anything else of that matter"; that her wills "had been destroyed" and "there is no other." In their discussions Jennie stated that she wanted to make sure that the farm stayed with one or the other of the boys; that if either wanted to sell, the other should have first chance to buy. The deed was drawn to make such a provision. She did not want it known that she was deeding the farm to the boys. She wanted "to keep it quiet," and said "I just don't want trouble, Bob, in the family." She felt that the others in the family would be disturbed if they knew that she intended Wesley and Wayne to have the farm. The deed to Wesley and Wayne bears date December 1, 1964. It was notarized on December 8, 1964. Wayne Shroyer told the notary public that Jennie wanted her to come out to notarize some papers. The notary refused to drive out to the farm because of bad weather conditions. Wayne then offered to drive her out and bring her back, to which she consented. When the notary first saw the paper to be notarized it was lying on a table in the kitchen. Jennie

asked the notary if she would notarize her signature "on that." The notary surmised that it was a warranty deed. Jennie folded it so that the notary could not see whose names were on the deed. Jennie did not identify the grantee. The notary considered that Jennie knew what she was doing but that for some reason Jennie wanted to keep the name of the grantee to herself. Only Jennie and the notary were in the room when the paper was notarized. Wayne was in another part of the house. The deed was not handed to Wayne in the notary's presence. It was lying on the table when the notary left.

Afterward Jennie told the Joneses that she had signed the deed; that she had conveyed the farm to Wayne and Wesley and that they were the owners; that "it belonged to the boys"; that she had consulted with them about selling the farm; that she did not want them to ever sell the farm and told them that "if it were she, she would not sell." In the weeks and months that followed and up until the time of her death Jennie "conveyed the attitude" to the Joneses "that the boys were the owners of the farm."

George Shroyer testified that about six months before Jennie's death he had a conversation with her at her home in which she told him that she had deeded the farm to Wayne and Wesley, and that "she told Wayne to take that deed and read it and he took it * * *"; that she "actually gave" the deed to Wayne and "told him it was his, but she wanted to keep it in her possession until she died"; that "she was going to keep the deed until she died"—"she was going to keep it in a safe place." When asked whether she told him why she didn't want Wayne to take the deed and put it of record he testified, "She wanted to keep it in the safety—to save any more trouble." Jennie did not say whether she might want to change the deed again. With reference to the will he testified that Jennie told him she had given Betty a will to keep; that the will was put in a bank box and kept for some time

and that the will was outstanding, but "it was to be destroyed." She did not tell George that she had asked for the return of the will or had taken any steps on her own to see that the will was destroyed. Neither Wesley nor Wayne ever said anything to George Shroyer to indicate that they were making claim to the land.

Mrs. Shroyer testified that Jennie told her that she had made the deed to Wesley and Wayne; that it was her intention that Wesley and Wayne have the farm; that she (Jennie) considered that the boys were owners of the farm, and that she did not want them to sell it; that Jennie told her that the previous will to Jessie Shroyer had been destroyed. Mrs. Shroyer also testified that Jennie said that Betty "was supposed to see that it was destroyed"; and that Jennie told her and George at the hospital that she was not going to live and that she wondered what the others would say when the deed was presented.

The lessee who quarried rock on the farm heard that Jennie had deeded all of her property to Wayne Shroyer. Concerned about his lease, he went to Jennie in July, 1966 and asked whether the land had been deeded to Wayne. She said "yes" but assured him that the deed was made after the lease and that she had "included the lease" in the deed. Jennie continued to live on the 80-acre farm and to collect royalties from the rock quarry until her death. She kept and retained the money for herself.

On July 5, 1966 Jennie wrote an unwitnessed and therefore ineffective "will" in her own handwriting, stating that she wanted to make known her wishes as to the disposal of her home and belongings. She recited that she had been alone, without financial help; that Virgil had always seen to it that she was comfortable; that since his passing his family had been wonderful to her; that his boys Wesley and Wayne "have been so helpful & still think of me first. To them I have deeded my

home of 80 acres. Not much for all they have done for me But it is my life's work having lived here alone for 30 years. They shall have a good deed to farm subject to a lease contract with Stark & Cole Inc. for the production of road rock & lime for which I get .06¢ per ton for all material sold This contract along with deed being part and parcel of farm shall go with the deed to Wesley & Wayne My royalty of .06¢ per ton shall be used until all my obligations are taken care of same consisting of a nice funeral Noel Moss put my brother away beautifully I should like the same * * * My heartfelt wish is that my estate being small as it is shall not need court action of any kind I have asked Bob Jones and Rachel to just take over when I pass on he said he would but without pay But I would prefer pay—and generous as they have been so helpful to me in those last years." Following her signature there were a number of specific bequests. She made this further statement:

"To Robert and Rachel Jones as Administrators

"My royalty payments check shall be deposited in the Peoples bank for my use until all accounts are settled when the deed to farm and lease contract including royalty payments (same being part and parcel of farm) shall be turned over to owners of farm Wesley and Wayne Shroyer. At my passing Robert Jones shall have full charge such as paying claims and distribution of funds he shall sign all papers and none shall be honored without the Peoples Bank O K"

After this statement she named those to whom should be given her father's picture; her bed; steer calf; reclining chair; range, big mirror, red rug, etc.

Jennie died in a hospital October 3, 1966. Two or three weeks before her death, just before going to the hospital for her final illness, Jennie obtained her "papers" from a bank box. At Jennie's instance the Joneses bought a metal strongbox for Jennie. Jennie put her papers in it and handed

the box to Robert Jones, asking him to keep it while she was in the hospital. Jones refused to take the key to the strongbox, preferring not to have access to the box. Jennie did not give Jones instructions as to what to do with the metal box other than to keep it—she did not instruct him to deliver it to anyone else. Specifically, she did not tell the Joneses to give the deed to defendants in case she died. Jones would have redelivered the box to Jennie at her request. The box stayed in the possession of the Joneses at their house until Jennie's death and was not opened by them. After Jennie's death the Joneses took the locked box to the probate office at Princeton.

On the night of Jennie's death Wesley Shroyer stated that he did not know anything about the Jennie Peters estate; that he did not know anything about a deed. Asked later if he knew anything about Jennie's business Wesley stated that he didn't know anything about it.

After Jennie's death Betty Daily took Jennie's will dated October 15, 1960 out of her bank box and turned it over to Wesley Shroyer. Wesley said nothing to Betty about a deed, made no claim that the land had been deeded to his brother and him, and promised that he would take the will to the probate court the next morning. When the family assembled at the probate court the probate judge said there was no valid will. Betty got up and said there was a valid will and that it was in Wesley's possession. Wesley "reluctantly" produced the will and handed it to the probate judge. At that time neither Weslay nor Wayne Shroyer made any mention of a deed conveying the property to them. At a second meeting Wesley and Wayne, who were designated as "administrators" in the will of October 15, 1960, qualified as co-executors. A search was made at Jennie's home for the keys to the box. Mrs. Jones found the keys in a vase on Jennie's dresser. Wayne and Wesley opened the metal strongbox at the time of the making of the inventory, took out the deed of December 1, 1964 and had it

filed for record on October 15, 1966. Later they went to Jessie and told her that there was a deed in the box made out to them, "so, therefore, the farm was theirs." The box and contents, including "General Warranty Deed," were listed in the estate inventory and appraisement.

Wayne and Wesley Shroyer did not testify concerning delivery of the deed because of the Dead Man's Statute. Wayne, however, was permitted to testify that he made an effort to keep the "fact" that he was the owner of the farm a secret from his sisters from the time the deed was executed until the time of Jennie's death.

■ On this appeal from a decree in equity it is our duty to review the evidence, determine its weight and sufficiency, and make our own findings, giving due deference to the findings and judgment of the trial chancellor. Cleary v. Cleary, Mo.Sup., 273 S.W.2d 340, 346; Klatt v. Wolff, Mo.Sup., 173 S.W.2d 933.

■ The only question is whether there was a delivery of the deed. The controlling element in determining this question, a mixed question of law and fact, is the intention of the parties, particularly the intention of the grantor. O'Mohundro v. Mattingly, Mo.Sup., 353 S.W.2d 786 [2]; Klatt v. Wolff, supra; Galloway v. Galloway, Mo.Sup., 169 S.W. 2d 883 [13]. The vital inquiry with respect to the grantor is whether she intended a complete transfer; whether she parted with dominion over the instrument with the intention of relinquishing all dominion and control over the conveyance and of making it presently effective and operative as a conveyance of the title to the land. Wheeler v. Rines, Mo.Sup., 375 S.W.2d 48, 50; Lape v. Oberman, Mo.Sup., 284 S.W.2d 538, 540; Forster v. Clark, 351 Mo. 59, 171 S.W.2d 647; Galloway v. Galloway, supra, 169 S.W.2d, 1.c. 888 [11]; Chambers v. Chambers, 227 Mo. 262, 127 S.W. 86. It is not necessary, in order to

constitute a delivery of a deed, that the instrument actually be handed over to the grantee, or to another person for the grantee. There may be a delivery notwithstanding the deed remains in the custody of the grantor. Baker v. Baker, 363 Mo. 318, 251 S.W.2d 31, 33 A.L.R.2d 1431, and authorities cited l.c. 37. A valid delivery once having taken place is not rendered ineffectual by the act of the grantee in giving the deed into the custody of the grantor for safekeeping. O'Mohundro v. Mattingly, supra, 353 S.W.2d, l.c. 792; Galloway v. Galloway, supra, 169 S.W.2d, l.c. 888 [15]; Hale v. Weinstein, Mo. Sup., 102 S.W.2d 650. It is all a question of the intention of the parties, which may be manifested by words or acts or both. Cleary v. Cleary, supra, 273 S.W.2d, l.c. 346.

■ The burden of proof of nondelivery of a deed is upon the party who seeks to invalidate the conveyance on the ground of nondelivery. Wilkie v. Elmore, Mo. Sup., 395 S.W.2d 168; O'Mohundro v. Mattingly, supra, 353 S.W.2d, l.c. 792 [1]; Sando v. Phillips, Mo.Sup., 319 S.W.2d 648; Klatt v. Wolff, supra; Galloway v. Galloway, supra, 169 S.W.2d, l.c. 888 [16, 17]; Zumwalt v. Forbis, 349 Mo. 752, 163 S.W.2d 574, 575; 26A C.J.S. Deeds § 183. In this case plaintiff, Jessie Shroyer, has the burden of proof of nondelivery.

■ Appellants-grantees claim the benefit of a presumption of delivery arising out of the fact that the deed was acknowledged, under § 490.410, RSMo 1959, V.A.M.S. and cases holding that under the statute the certificate of acknowledgment takes the place of proof that the deed was signed and delivered, and is prima facie evidence that the deed was duly executed, i. e., that it was signed and delivered. Baker v. Baker, supra, 251 S.W.2d, l.c. 37 [8]. There is no such presumption in this case. "If there were nothing shown but the deed, duly acknowledged, and the fact that it was recorded and in possession of the defendant, the rule would settle the case in defendant's favor; but the plaintiff showed at the outset that the deed was not in possession of the defendants at the death of the grantor, but in possession of the grantor and placed among his other papers." Harrison v. Edmonston, Mo.Sup., 248 S.W. 586, 588. This deed was not recorded at the time of the grantor's death. The circumstances that the instrument was not recorded and was in the grantor's possession at the time of her death, unless explained, are deemed "conclusive that the parties did not intend a complete transfer." Phillips v. Phillips, 50 Mo. 603, 606. In this connection see Sando v. Phillips, supra, 319 S.W.2d, l.c. 652 [7].

■ Appellants further claim a presumption of delivery from their showing that the deed was in the possession of the grantees. Such a presumption arises where there is an unequivocal showing that grantee was given possession of the deed. Baker v. Baker, supra, 251 S.W.2d, l.c. 37 [9]. The showing is equivocal in this case, for here the evidence indicates that grantor handed it to one of the two grantees momentarily, for the purpose of reading it, and that at grantor's direction it was immediately taken back into grantor's possession, to be kept by her until her death. A presumption of delivery does not arise under these circumstances.

■ On the contrary, there is a presumption in this case in favor of respondent, not appellants. There is a presumption of *nondelivery*, in view of the conceded fact that the deed was in grantor's possession at the time of her death and that the deed was not then recorded. "By the introduction of testimony substantially tending to show that the deed was in the grantor's possession, in his safety deposit box, at the time of his death, the plaintiffs made a prima facie case; for, if unrecorded and in the grantor's possession, the nondelivery of the deed is presumed. 26 C.J.S. Deeds § 184; 16 Am. Jur. Deeds, § 386; Phillips v. Phillips et

al., 50 Mo. 603." Galloway v. Galloway, supra, 169 S.W.2d, 1. c. 888 [19].

■ This showing placed upon grantees, defendants Wesley and Wayne Shroyer, the burden of going forward with the evidence[1] to rebut plaintiff's prima facie case. Idem. To sustain this burden defendants introduced George and Beulah Shroyer's testimony.

■ In reviewing the evidence in this case we are conscious of the fact that the determination of delivery *vel non* depends to a large extent upon the credibility of George and Beulah Shroyer and the interpretation of their testimony. In weighing their testimony as well as all of the rest of the testimony in the case, and in making our own independent findings, we are aided and assisted by the findings and judgment of the chancellor, who heard and observed the demeanor of the witnesses and was in by far the best position to judge of their credibility and reliability. So armed and informed, and with due deference to the chancellor's findings, it is our conclusion that grantees-defendants Wesley and Wayne Shroyer have not met and sustained the burden of rebutting plaintiff's prima facie case of nondelivery.

We find that Jennie, under the false impression that her will of October 15, 1960 had been destroyed, made a warranty deed on December 1, 1964 and executed it one week later, by which she intended and undertook to convey her 80-acre homeplace to her nephews Wesley and Wayne Shroyer, but that she did not deliver, or intend to deliver, the deed to Wayne with the intention of relinquishing all dominion and control over the conveyance or of transferring title to Wesley and Wayne *in praesenti*; that in December, 1964 she wanted her nephews to eventually become the owners of the farm; that her attempts to effect such a transfer of title by the deed in question were ineffective for lack of delivery; that the deed never became operative and was properly cancelled and set aside by the chancellor and defendants properly called to account for the royalties received from the operation of the rock quarry. We are impelled to these findings by all of the evidence considered in its totality, being especially persuaded by the following facts: The deed did not reserve a life estate to Jennie. Such a reservation would have raised a strong presumption that she intended that title should immediately vest in the grantees. Baker v. Baker, supra, 251 S.W.2d, 1.c. 37. Grantor retained possession of the deed until the date of her death.[2] Grantees had no access to and no permission from grantor to take possession of the deed. It was found in her strongbox, which she had placed in the temporary custody of her trusted friends and neighbors, Robert and Rachel Jones. Grantor retained the keys and had the right to call for the return of the strongbox and its contents, including the deed in question, at any time.[3] Grantor did not place the deed in the possession of her banker, the notary, the Joneses, her brother George (in whom she confided in business matters), or anyone else, with directions to deliver the deed to the grantees.[4] Grantor had a

---

1. (more accurately, the burden of persuasion)

2. Galloway v. Galloway, Mo.Sup., 169 S. W.2d 883, 888 [19]. "A deed in the possession of the grantor is presumed never to have been delivered; especially where it was in his possession and under his control at the time of his death." 23 Am. Jur.2d Deeds § 116. And see 26A C.J.S. Deeds § 184.

3. Forster v. Clark, 351 Mo. 59, 171 S.W. 2d 647, 649.

4. Reasor v. Marshall, 359 Mo. 130, 221 S.W.2d 111, 117; Mendenhall v. Pearce, 323 Mo. 964, 20 S.W.2d 670; Van Huff v. Wagner, 315 Mo. 917, 287 S.W. 1038; Meredith v. Meredith, 287 Mo. 250, 229 S.W. 179; Peters v. Berkemeier, 184 Mo. 393, 83 S.W. 747.

penchant for changing her mind about the disposition of her property, and frequently did so. Nondelivery would make it possible for her to destroy the deed and otherwise dispose of the farm if she later decided to do so.[5] The secrecy employed in the transaction is consistent with nondelivery and retention of control over the deed.[6] Nondelivery would make it less likely that the transaction would come to the attention of the other members of the family than delivery. When the deed was found, after grantor's death, it had not been recorded. Grantor's retention of the unrecorded deed, in a place under her control, was consistent with her previous history of change in the disposition of her property. The significance grantor's manual handing of the deed to Wayne (if this actually happened) might otherwise have had is overcome by the fact that the deed was never recorded. The failure to record is consistent with the conclusion that grantor did not intend to pass to the grantees any present title, and no title at all until her death.[7]

George Shroyer's testimony that Jennie told him that she handed the deed to Wayne is not conclusive that delivery was intended.[8] What Jennie is supposed to have said at the time is not necessarily indicative of that intent but is subject to the interpretation that she was merely exhibiting the deed to Wayne to inform him of the fact that she intended the boys to have the farm at her death and to permit him to read the instrument, but that she was reserving control over the deed. It

is a reasonable inference that if she handed the deed to Wayne it was " * * * merely for temporary convenience at the time, and [her] continued possession of the instrument afterwards indicated an intention to retain control of it." Harrison v. Edmonston, Mo.Sup., 248 S.W. 586, 588 [2].

That she intended to retain control over the farm is confirmed by her subsequent exercise of acts of ownership over the farm, continuing to live there and operate it, and receiving and keeping the royalty payments for her own use and benefit.[9] The fact that defendants were not placed in possession of the farm is yet another indication that Jennie did not intend to pass title presently.

George Shroyer's testimony relative to Jennie's exhibition of the deed to Wayne, and the theory of delivery, is detracted from by the testimony suggesting that neither Wesley nor Wayne, prior to Jennie's death, seemed to know anything about Jennie's estate or of the existence of a deed, and that after Jennie's death, when the family gathered at the probate office for the reading of the will, Wesley and Wayne did not speak up, or claim the property by virtue of a deed, or suggest the existence of a deed from Jennie to them.

In addition to the foregoing reasons, the conclusion that the deed was not delivered at the time it was executed and acknowledged is buttressed by the writing of July

5. Tyler v. Hall, Mo.Sup., 106 Mo. 313, 322, 17 S.W. 319.

6. Forster v. Clark, 351 Mo. 59, 171 S.W. 2d 647, 649.

7. Wheeler v. Rines, Mo.Sup., 375 S.W.2d 48, 51 [4]; Forster v. Clark, 351 Mo. 59, 171 S.W.2d 647, 649.

8. "A manual delivery of a deed is not conclusive proof of a delivery, since the transfer of the dominion and control over

the deed must be unhampered with the reservation of any right of revocation or recall and must be with the intent to presently pass title [citing cases]." Klatt v. Wolf, Mo.Sup., 173 S.W.2d 933, 936 [5].

9. Reasor v. Marshall, 359 Mo. 130, 221 S.W.2d 111, 117 [13]; Wilcox v. Coons, 359 Mo. 52, 220 S.W.2d 15, 22 [8]; Forster v. Clark, 351 Mo. 59, 171 S.W.2d 647, 649.

5, 1966 (some 19 months after the deed was executed) in which Jennie by a purported will in her own handwriting plainly demonstrated that she did not consider that the deed had been delivered so as to pass title in December, 1964. Although she recited that she *had deeded* her home of 80 acres to the boys, and gave her reasons, the wording used strongly indicates her intention that they were to take in the future. The boys *"shall* have a good deed to the farm." The rock contract *"shall* go with the deed to Wesley and Wayne." The royalties were to be used to pay her funeral expenses and other obligations (still retaining control over the proceeds of the quarry) and *after all accounts are settled* the deed and lease *"shall* be turned over to the owners of the farm Wesley and Wayne Shroyer." (Our emphasis.) This is not the language of a grantor who considered that she had previously transferred and relinquished all right, title and interest in a farm, by making and delivering a deed to the grantees. This "voice from the grave," so to speak, weighs heavily in our determination that Jennie did not deliver the deed, and that as late as approximately three months prior to her death Jennie did not consider that she had already delivered the deed and given up the property to her intended beneficiaries, but rather considered it yet necessary to make a will providing for the postmortem delivery of the deed.

The judgment is affirmed.

WELBORN and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.