**Lula Emma WILLIAMS, Earl West, Eula May Byerley and Donna Fay Lofton, Plaintiffs–Appellants,**

v.

**Terry COLE, Defendant–Respondent.**

**No. 15413.**

Missouri Court of Appeals,
Southern District,
Division Two.

Dec. 5, 1988.

Scott B. Stinson, Mountain Grove, for plaintiffs-appellants.

Michael J. Patton, Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, for defendant-respondent.

PER CURIAM:

This is an action to set aside a deed on the ground that it was never delivered to the grantee. The realty involved is a 1-acre tract located in the city of Norwood, in Wright County, Missouri. There is a house on the premises. The property was owned by Johnnie Wesley Clemons when he died intestate on August 28, 1986. Plaintiff Lula Williams is Johnnie's sister; she is also the personal representative of his estate, which, at the time of trial, was being administered in the Probate Division of the Circuit Court of Wright County. Plaintiffs Earl West, Eula May Byerley and Donna Fay Lofton are the children of Johnnie's sister Mattie, who is deceased. Defendant Terry Cole is a nephew of Beulah Clemons, Johnnie's wife. Beulah died in May 1983.

Johnnie was in good health until he was hospitalized 3 weeks before his death. He managed his own financial affairs, drove, his own car and maintained his house and the premises on which it was situated. Plaintiffs concede in their brief that Johnnie was mentally competent when the deed in litigation was executed. There is no claim that the execution of the deed was procured by undue influence.

The deed was uncovered by plaintiff Lula Williams when she went to Johnnie's house "[a]bout a week and a half" after Johnnie died. Johnny Cramer, who is another of Beulah's nephews, was present in the house with his wife Eleanor when Lula arrived. The purpose of the collective exploration of Johnnie's house was "[t]o get that little box." Lula did not know where the box was, but Cramer and his wife did. A box was found in Johnnie's "spare" bedroom. The box was opened and the deed in suit was discovered. The defendant was advised that Lula and Mr. and Mrs. Cramer were going to Johnnie's house, but he declined to accompany them. The deed was thereafter delivered to the defendant and he had it recorded.

The execution of the deed was undoubtedly part of a testamentary plan Johnnie and his wife had developed. Lula's testimony was that Johnnie had telephoned her "... probably close to a year before he died and said that he was fixing up a paper—the papers for my youngest son, Don, and Terry [the defendant] to have the place, and that they were to take it and sell it and pay his—all of his debts and his funeral, and then divide the remainder."

The defendant's recollection of Johnnie's plans was more elaborate. The defendant's wife and Johnnie's wife died about the same time. The defendant testified that some time before his wife died, Johnnie and Beulah had indicated "what they intended to have done with their property." Initially Johnnie and Beulah, or Johnnie, after Beulah's death, indicated that the proceeds from an insurance policy and the sale of household goods should be applied to debts and funeral expenses and any remaining assets should be divided in equal shares between the defendant, defendant's brother and Johnny Cramer, who as we have said was another of Johnnie and Beulah's nephews. Some time later, according to the defendant, Johnnie decided "... that it might be less complicated just to have me on there and let me take care of it because he trusted me, and he said I would do it right." When this testimony is read in context, it is clear that the defendant meant Johnnie considered it to be less com-

plicated to deed the property to the defendant alone, and to allow the defendant to dispose of his (Johnnie's) property, because Johnnie trusted the defendant to attend to business fairly and honestly.

The plaintiffs first contend that the undisputed evidence that the deed was unrecorded and in the grantor's possession at the time of his death raised a presumption of non-delivery and shifted the burden of persuasion to the defendant. Defendant's evidence that: 1) the grantor had on several occasions offered to give the deed to the defendant for recording, and 2) the grantor told third parties he had the papers made up and that the place was defendant's, and 3) the grantor told the defendant where he was keeping the deed and that it needed to be recorded, plaintiffs argue, did not constitute substantial evidence sufficient to rebut the presumption of non-delivery, in light of undisputed evidence that: 1) the grantor never physically delivered or showed the deed to the defendant or any other third party during his lifetime; 2) the grantor retained the right to recall the deed by keeping it in his bedroom until the time of his death; 3) the grantor exercised all incidents of ownership over the property until his death while the grantee exercised no incidents of ownership, and 4) the deed reserved no life estate in the grantor.

The plaintiffs also contend that the deed was never accepted by the defendant, but we find it unnecessary to rule on this assignment of error.

The plaintiffs cite *Shroyer v. Shroyer*, 425 S.W.2d 214 (Mo.1968) and *Meadows v. Brich*, 606 S.W.2d 258 (Mo.App.1980) as controlling in this case, and we agree that those cases state the applicable principles of law. The only question in this case is whether there was a delivery of the deed. As stated in *Shroyer*, 425 S.W.2d at 219–20:

"The vital inquiry with respect to the grantor is whether [he] intended a complete transfer; whether [he] parted with dominion over the instrument with the intention of relinquishing all dominion and control over the conveyance and of making it presently effective and operative as a conveyance of the title to the land. (citations omitted) It is not necessary, in order to constitute a delivery of a deed, that the instrument actually be handed over to the grantee, or to another person for the grantee. There may be a delivery notwithstanding the deed remains in the custody of the grantor. (citation omitted) A valid delivery once having taken place is not rendered ineffectual by the act of the grantee in giving the deed into the custody of the grantor for safekeeping (citations omitted)...."

The court then noted that the evidence indicated the grantor had handed the deed in question to one of the grantees momentarily, for the purpose of reading it, and that at the grantor's direction it was immediately taken back into the grantor's possession, to be kept by her until her death. The court then stated:

"[In this case] [t]here is a presumption of *nondelivery*, in view of the conceded fact that the deed was in grantor's possession at the time of her death and that the deed was not then recorded. 'By the introduction of testimony substantially tending to show that the deed was in the grantor's possession, in his safety deposit box, at the time of his death, the plaintiffs made a prima facie case; for, if unrecorded and in the grantor's possession, the nondelivery of the deed is presumed.' (citations omitted)

This showing placed upon the grantees ... the burden of going forward with the evidence to rebut plaintiff's prima facie case...."

*Shroyer*, 425 S.W.2d at 220–21.

What evidence, then, did the defendant have to rebut the presumption of nondelivery? The defendant testified:

\* \* \* \* \* \*

"Q. After your—After both of your wives had died, Terry, did [Johnnie] ever again talk to you or mention to you the disposition of his property?

A. Yes.

Q. Can you tell me what he said?

A. Well, at first he talked about—He needed—He'd ask—He said, 'Well, we need to go over to Hartville and get the papers made up.' And he would sit and talk, said, 'Oh, we need to get that done.' ... So I was through there—I can't remember the exact date, but it was in January, February—the winter of '84, I believe. He was talking about he'd been to Hartville and he'd had some papers ...—some other things he had to take care of. And he said, 'I've got the deed and things taken care of.' ... He said, *'You need to get it recorded.'*

\* \* \* \* \* \*

Q. Okay. Once he told you he had made the deed or had already done it on his own, what did he say then?

A. He said, 'Sometimes ...' He said, 'You need ...' *'I'll give it to you, and you can get it recorded.'* And I said, *'Well, you keep it for me.'* I said, 'I ...' ... I had a lot of other things going on at that time, and I said, 'I know where it is. You just keep it here at the house.' And he said, 'It's in here.' And at that point, he brought out an insurance policy for $1,000, and he said, 'Now, I've had this made [to] you as a beneficiary on this insurance policy.' I said, 'That's fine.' I said, 'You keep it, and that way I'll know where it is.' And I said—And he said, 'Well, it'll be in the front bedroom.' And I said, 'That's fine.' I said, 'At least we know where it is, and it's in safe keeping.'

Q. Okay. Terry, did he try then, on that day, to give you both the deed and the insurance policy?

A. He wanted me to take them. *I never would take them because of the fact that I would—I didn't want to hurt anybody's feelings. I didn't want Gary and Johnny*[1] *to think that I was jumping in,* you know, just—And I said, 'Let's let you keep it, and then that way....'

\* \* \* \* \* \*

Q. Did he, on more than one occasion, Terry, try to get you to take the deed and the papers with you?

A. Yes, he did.

Q. And did you always refuse those offers to him for the reasons that you've already told the Court—

· A. True." (Emphasis added.)

\* \* \* \* \* \*

The defendant admitted that he had never seen the deed before he "picked it up" after Johnnie's death; he never saw the metal box in which Johnnie kept his valuable papers. The most that can be said in this case is that Johnnie told the defendant that he, Johnnie, had executed a deed conveying the 1–acre lot to the defendant. Among the circumstances which militate against a delivery are that the grantor never showed the deed to the grantee; the grantee was not even given that glimpse of the deed which the grantees received in *Shroyer* and in *Meadows.* The grantor retained possession of the deed, without recording it, until his death. He did not place the deed in the custody of a third person, with directions to deliver it to the grantee. There are other circumstances which might be recited, but in our view the evidence is simply insufficient to rebut the presumption of nondelivery. Accordingly, the judgment is reversed and the cause is remanded with directions to set aside the deed described in plaintiffs' petition.

PREWITT, P.J., and HOGAN, FLANIGAN and MAUS, JJ., concur.

---

1. Gary Cole and Johnny Cramer were also Johnnie Clemons' nephews.